UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CHARLES MAUTI,

**Plaintiff**

v. CA NO. 06-61T

LAUREN MATARESE, ET AL.,

Defendants

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

This Reply Memorandum addresses several of the arguments made by the defendants in their opposition to the Plaintiff's Motion to Compel. Several of the specific requests are discussed below. There are however two preliminary matters worth mentioning at the outset.

First, to assist the Court in dealing with the conflicting representations about the nature and quality of the Town of Westerly's response to Plaintiff's document requests, Exhibit A to this Reply Memorandum is a copy of all of the documents produced – a total of eighty six pages.

Second, the Plaintiff emphatically does ***not*** agree "that the essential facts as to what happened, along with the players involved, are, for all intents and purposes, undisputed . . . ," Defendants' Memorandum of Law in Support of Objection, at 1 (hereafter "Defendants' Memorandum"). That assessment is way wide of the mark.

What little agreement there is does not go far beyond the fact that on May 10, 2005, Captain Lauren Matarese, the second ranking officer in the Westerly Police Department, stopped Plaintiff Charles Mauti as he was driving from his home in Westerly to his job as Hopkinton's Building and Zoning official. Matarese then arrested Mr. Mauti for violating

R.I.G.L. § 31-10-1, which requires Rhode Island residents to get a Rhode Island drivers license within thirty days of moving to the state. When he was stopped, Mr. Mauti had an active valid driver's license issued by the State of Arizona, where he had lived before moving to Rhode Island.

From their Memorandum opposing the Motion to Compel it is clear that the defendants would like the Court's focus to be solely with the sufficiency or lack of probable cause for Matarese to stop Mr. Mauti. That is certainly *one* of the issues, and it is the basis of Count 1 of the Complaint. But the arrest was illegal for an additional and even more basic reason as set forth in Count 2 of the Complaint – the "crime" for which Mr. Mauti was arrested and prosecuted – violating R.I.G.L. § 31-10-1 – is not a crime at all. It is specifically defined by Rhode Island law as a "civil violation." It follows that Matarese had no authority to *arrest* Mr. Mauti, *regardless* of whether she had probable cause to stop him in the first place, since probable cause to arrest someone for a civil violation is an oxymoron. *See, e.g., State v. Frazier,* 421 A.2d 546, 549-550 (R.I. 1980) (missing license plate could not create probable cause for arrest since, *inter alia*, "a missing license plate is a 'violation' for which a citation would be issued to the operator for subsequent disposition within the framework of the Department of Transportation's Administrative Adjudication Division") (footnotes omitted); *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law.").[1]

---

[1] The First Circuit's statement in *Forest v. City of Pawtucket* regarding the nature of probable cause is typical:

> "[P]robable cause analysis requires inquiry into the facts and circumstances within the arresting officer's knowledge at the time of arrest to determine if a person of 'reasonable caution and prudence' would have believed that the defendant *committed a crime*."

377 F.3d 52, 56 (1st Cir. 2004) (emphasis added), quoting *Floyd v. Farrell*, 765 F.2d 1, 5 (1st Cir. 1985).

Section 31-10-1(a) requires that a person obtain a Rhode Island drivers license within thirty days of becoming a resident of the state. The section itself contains no penalty provision, which brings it within the terms of section 31-27-13(a):

> It is a civil violation for any person to violate any of the provisions of chapters 1 -- 27 or chapter 34 of this title, unless the violation is by these chapters or other law of this state declared to be a felony or a misdemeanor, or unless the offense is punishable by a fine of more than five hundred dollars ($500) or by imprisonment.

Since section 31-10-1 is *not* classified as a misdemeanor or a felony,[2] and itself contains no penalty provision, by the terms of R.I.G.L. § 31-27-13(a), quoted above, it is a "civil violation."

Mr. Mauti is not alone in his view that the nature of the charge made his arrest and subsequent misdemeanor prosecution in state district court illegal. Two of the Department's patrol supervisors, Corporal David Lachapelle, the shift supervisor at the time of the arrest, and Sergeant Shawn Lacey, who handles Rhode Island Traffic Tribunal prosecutions for the Department, both testified that a violation of § 31-10-1 is *not* an arrestable offense, but should instead be handled by issuing a Traffic Tribunal summons. Exhibit B (Lachapelle TR 75-77).[3] Notably, Corporal Lachapelle told Defendant Matarese just that when she arrived at the station after arresting Mr. Mauti, before she had commenced the misdemeanor prosecution on the same charge in state district court. She disagreed with him, responding (in his words) that "people get arrested for it all the time." *Id.*, 75. Lachapelle could not remember anyone ever being arrested for it in his nineteen years with the Department. *Id.*, 75-76.

---

[2] Three other subsections of chapter 10 of Title 31 – §§ 31-10-6, 31-10-35, and 31-10-39 – *are* expressly classified as misdemeanors by R.I.G.L. § 31-10-43.

[3] Sergeant Lacey's testimony had not been transcribed as of the filing of this Reply Memorandum.

Lachapelle also discussed Mr. Mauti's arrest with Defendant Frank Brancato, who was the officer who received the call to assist Matarese and who transported Mr. Mauti to the police station:

Q. What did you say to Officer Brancato about the charge?

A. That it was the wrong charge. That normally in that situation, as far as myself and the officers I have seen, you just use the RITT summons. It is not an arrestable offense.

Q. What was Officer Brancato's reaction?

A. He agreed. He was a quiet guy.

Lachapelle TR 105.

The second reason that the probable cause issue may have to give up center-stage in this case is quite different, but equally disturbing. Even with the limited discovery he has managed to conduct to this point through depositions convened without any of the requested documents, Mr. Mauti has heard testimony that it was "the general consensus" among a number of the Department's patrol supervisors that the real explanation for Mr. Mauti's arrest was quite different from the version the defendants give in their Memorandum. That "consensus" is that Matarese subjected Mr. Mauti to a full custodial arrest and criminal prosecution not as the result of a routine traffic stop, but rather she did so "as a favor" to the police chief in Hopkinton, John Scuncio. Scuncio bears a long-standing grudge against Mr. Mauti for (among other things) publicly criticizing Scuncio's misuse of a criminal background check to embarrass another Hopkinton official (and police department critic) into resigning several years earlier.

That issue first arose at the change of shift the morning of Mr. Mauti's arrest, when Sergeant Shawn Lacey, one of the incoming shift supervisors, mentioned to Corporal

Lachapelle and the other first shift Sergeant, Stano Trombino, that "Mr. Mauti and Chief Scuncio had an internal problem going in Hopkinton, something about zoning or properties." Lachapelle TR 93. Lachapelle said that one of the two incoming Sergeants then suggested that Mr. Mauti's arrest was related to his dispute with Scuncio:

> A. Whichever one said that to me, that Mr. Mauti and Chief Scuncio had a problem with each other in the Town of Hopkinton and that they felt, whichever one said it, that she was probably doing Scuncio a favor. That is not my business.
>
> Q. Did you understand -- whoever said that, did you understand them to mean that Mr. Mauti's arrest was made at the request of Chief Scuncio?
>
> A. Well, I would not use request.
>
> Q. What would you use?
>
> A. I would use as a favor.

Lachapelle TR 95. Corporal Lachapelle also discussed the possibility that Scuncio had asked Matarese to arrest Mr. Mauti with two other Sergeants, Michael Gulluscio and Robert Warner. He summarized the various discussions as follows:

> Q. Of all of the people you talked to, do you remember anyone agreeing or disagreeing with that suggestion?
>
> A. I think it was a general consensus from all that they agreed.
>
> Q. That they agreed that that was the motive for Mr. Mauti's arrest?
>
> A. For Chief Scuncio, as a favor to Chief Scuncio, yes.
>
> Q. When you say there was a general consensus, who would you include in that general consensus, Sergeant Trombino and Sergeant Lacey?
>
> A. Yes.
>
> Q. Sergeant Gulluscio and Sergeant Warner and Corporal Green?
>
> A. I don't know about Corporal Green.
>
> Q. But the two sergeants?

A. Yes.

Lachapelle TR 110-11.

These two issues – the nature of the offense for which Mr. Mauti was arrested, and whether his arrest was "a favor" to John Scuncio in retaliation for Mr. Mauti's public criticism of him – are central to this case. For that reason, the Town's responses to the particular Requests for Production should be assessed with these issues in mind.

**Request 2: Westerly Police Department Policies and Procedures**

Since receiving the defendant's objection, deposition testimony has revealed that the Department several months ago replaced the Policies and Procedures Manual that was in effect at the time of Mr. Mauti's arrest with a completely new Policies and Procedures Manual. Lieutenant Michael Turano testified that when copies of the new manual were recently distributed to each officer, their copies of the old Policies and Procedures Manual were collected. When asked what happened to the copies of the old Manual, Turano responded: "I believe they were destroyed. Lieutenant Toscano collected all of the old books. They were turned into him." Exhibit C, Turano TR 22.

That testimony that the Department's "old" Policies and Procedures Manual was destroyed was given on September 8, 2006. On the record at the deposition and by letter the same date Plaintiff's counsel asked defense counsel to determine whether the Department still had a copy of the old Manual. There has been no response.

Since the policies and procedures of the police department are central to the issue of municipal liability under section 1983, a proposition that the Defendant Town does not take

issue with in its Objection, copies of both manuals should be ordered produced. Deposition testimony indicated that the new manual is available in electronic form on the Department's intranet. Turano TR 24. A copy of that computer file should be produced.

**Requests 3,4: Training Materials**

Having interposed a blanket objection to producing training materials on the substantive areas directly implicated by the claims in this case, the Town now suggests that the request for training materials should be limited to material concerning the two individual defendants. It goes on to assert that "the entire training files of those two defendants were produced." Defendants' Memorandum at 5. But what counsel now refers to as complete "training files" are nothing more than a sixty-page assortment of certificates or transcripts of attendance at various training sessions or courses, with absolutely none of the substantive materials that were doubtless provided in connection with the training sessions attended. Exhibit A, 14-74.

Most of the certificates memorialize training in subjects that seem remotely relevant if they are relevant at all. We now know, for example, that Captain Matarese can operate an all-terrain vehicle (*id.*, 65), that she spoke to a physics class at Westerly High School five years ago (*id.*, 57), and that she took a scuba-diving course in 1983 (*id.*, 35). But despite the fact that Matarese has attended training sessions conducted by the Rhode Island State Police on the policies and procedures applicable to the RILETS/NCIC system in 1989, 1996, and 1999 (*id.*, 26, 33, 64), we have none of the substantive materials distributed at those events. We know that they exist, however, but only because Dispatcher Donald Cornell recently testified that some of the material he was given at the 2003 RILETS/NCIC training session is still "kicking around," either at home or in his locker at the police station. As with other

requests, until his October 3d deposition, Mr. Cornell's training materials seem to have been overlooked in whatever effort was made by the Department to identify and collect documents responsive to Plaintiff's Requests.

There is a lot more responsive material. The Department's Director of Training since October of 2004, Lieutenant Michael Turano, testified that he maintains a six month training schedule, which is currently available to WPD officers on the Departments 'intranet,' an internal website available only to Department employees. Turano TR 8-9. Before he began posting the schedule on the Department intranet, Wright had prepared and distributed hard copies of the training schedule. When asked if he had copies of the training schedules dating back to October of 2004, Turano responded "I would have to look." Turano TR 11-12. Since those schedules are clearly responsive to Request 3, it appears again that whatever effort was made to identify and collect responsive documents did not include asking the Director of Training whether he had any training materials.

A different and even more serious concern was Lieutenant Turano's testimony that when he became the Director of Training in October of 2004, six or seven months before Mr. Mauti's arrest, he began going through the "large filing cabinet" full of WPD training materials and throwing away some of the materials that had collected there. At the time of his deposition on September 8, 2006 – seven months after the Complaint in this case was filed – Turano had "just completed" the process of throwing away "dated" training material. Turano TR 12. He confirmed that this meant that some of the some of the training materials have been destroyed:

> Q When you went through the file cabinet, were you able to bring yourself to actually toss old training materials, throw them away?
>
> A. Yes.

Turano TR 19. Lieutenant Turano's testimony strongly suggests not only that the defendants have thrown away relevant evidence since this case was filed in February of this year, but that they continued to throw such material away even ***after*** Plaintiff's pending Request for Production was served back in June.[4]

**Request 5: Policies and Procedures Regarding Use of the RILETS/NCIC System**

The Town's Memorandum states that "[t]he Westerly Police Department's policy and procedure for use of the RILETS system was voluntarily produced at the deposition of Lt. Wright on September 12, 2006." Defendant's Memorandum at 6. That statement is misleading in several respects.

First, the document produced at Wright's deposition appears to be an excerpt from the Department's ***new*** Policies and Procedure Manual, ***not*** the Manual that was in effect at the time of Mr. Mauti's arrest. As noted before, in a case where the claims depend on proof of a municipalities practices, policies and procedures, the Plaintiff is entitled to complete copies of both Manuals, assuming that all copies of the old Manual have not been thrown away, as Lieutenant Turano testified.

[4] It was not only Turano's testimony on September 8th that he had "just completed" the process of cleaning out the file cabinet. There was also the following exchange:

Q. You did inherit material, some of which was useful and some of which was not?
A. That's correct.
Q. For the material that was not useful, was it because it was dated?
A. Yes, for the most part.
Q. What did you do with it, *did you spend your first month* as a training officer cleaning that collection up?
A. I just completed that. It was a rather large file cabinet.
Q. It was not the first month, *it was the first 24 months*, right?
A. Yes.

TR 12.

Second, once again deposition testimony shows that there are other responsive documents that have not been produced. WPD Dispatchers Karen Greber and Donald Cornell both testified that they use a two-inch thick notebook kept in the dispatcher's area entitled "NCIC System," which deals specifically with the procedures for use of the RILETS/NCIC system. Mr. Cornell also testified that he still has materials from the RILETS/NCIC certification program run by the State Police that he attended in 2003.

Finally, it is not quite right to state that the two page document Defendant's refer to was "voluntarily produced" at Lieutenant Wright's deposition. Nothing at all was produced until after Lieutenant Turano testified that he had a Memorandum in his desk drawer about RILETS/NCIC policies and procedures. Plaintiff's counsel specifically requested that the Memorandum Turano mentioned be produced at Wright's deposition, since, as the Department's "Terminal Agency Coordinator," Wright is ostensibly responsible for monitoring the Department's use of the RILETS/NCIC system in conjunction with the Rhode Island State Police. Whether the document that was brought to Wright's deposition is the same document Lieutenant Turano mentioned is by no means clear. If they are different, they should both be produced.

**Request 7 : RILETS/NCIC Inquiries Regarding Mr. Mauti**

Defense counsel states that "[a]t the outset of this case, the defendant voluntarily produced the RILETS checks that were made in connection with the plaintiff." Defendant's Memorandum at 5. That is simply not true. Deposition testimony of Department employees makes clear that copies of the results of the RILETS/NCIC inquiries that were run on Mr. Mauti have ***still*** not been produced.

The two page computer printout to which defense counsel refers (Exhibit A, at 76-77) was created in April of 2006, nearly a year after Mr. Mauti's arrest, months after this case was filed, apparently in response to a request from defense counsel. Karen Greber, a WPD dispatcher of sixteen years experience, testified that it appears to be a list, quite possibly incomplete, of six separate RILETS/NCIC inquiries concerning Mr. Mauti that were made from the Westerly police station – the first four were made on May 10, 2005, the day of his arrest. The last two listed inquiries, however, were made during the afternoon the day before Mr. Mauti's arrest.[5]

None of the witnesses deposed to this point – including two of the Department's more experienced dispatchers, could identify, authenticate, or even decipher the document. Neither of the WPD dispatchers who have been deposed, Karen Greber and Donald Cornell, knew quite what to make of it. They both testified that responses to RILETS/NCIC inquiries typically include information that is *not* shown on the document the Town produced.

Donald Cornell testified that while the two page document produced was ***not*** the same as the printout of the NCIC inquiry results he is used to seeing, it is possible to retrieve and display on the dispatch terminal screen the actual results of old NCIC inquiries as long as the inquiries were made from Westerly's terminals. In other words, the Department should be able to retrieve and provide to the Plaintiff the results of the NCIC inquiries made about Mr. Mauti that are shown on the two-page document produced, but it apparently must first be ordered to do so.

[5] Defense counsel stated on the record at Donald Cornell's deposition on October 3d that the Department is unable to identify who it was that twice accessed the NCIC database looking for information about Mr. Mauti the day before he was stopped and arrested by Defendant Matarese.

**Request 8: RILETS/NCIC User Codes and Information**

The Town's initial response to this Request stated: "Such documents, to the extent they exist, are not within the possession or control of the Westerly Police Department." That statement was directly contradicted by both WPD dispatchers Karen Greber and Donald Cornell, who both testified that there is a two inch thick notebook describing how to use the RILETS/NCIC System that is kept at their desks in the dispatch area. Yet again the Town's response to this Request, as with numerous others, raises serious questions about what if any inquiry was made when the Plaintiff's Requests were served back in June to determine what responsive information existed. The dispatchers are the Department employees who deal with the RILETS/NCIC system all day long, handling requests for inquiries from patrol officers. Dispatch was the first place to look and the dispatchers were the first ones to ask in order to collect responsive documents.[6] From all appearances, that was not done.

**Requests 10 through 18: Arrest and Citation Data**

The request for traffic stop data, which every municipal police department is required by statute to collect and report to the state Attorney General, was initially suggested by Plaintiff's counsel as a possible shortcut to obtain data showing the breakdown of traffic stops and arrests by offense category; the thought was that it using information already collected might avoid the Department having to review numerous arrest reports. Deposition testimony has revealed, however, that the Town has an even easier means of responding to this series of requests. It has maintained for the past four years a computer database that

[6] Dispatcher Donald Cornell testified that he still has RILETS/NCIC training materials from the last training session he attended in 2003.

contains information about every arrest and every traffic citation issued by WPD officers. Lachapelle TR 22-28. According to Corporal David Lachapelle, one of the shift supervisors, reports from that database sorted by various criteria (including individual officer, type of offense, date) covering the entire four year period can be generated in a matter of minutes. Lachapelle TR 29-31.

Given the ready availability in this form of much of the information sought in Requests 10 through 18, the Town should be ordered to produce the database and a copy of the software used to access the information it contains. To do so entails practically no burden on the Town, and at the same time allows for the Plaintiff's review and analysis of the information in the form in which it is maintained by the Department. While there will likely be follow-up requests for specific information based on that review and analysis, the use of the database will make them more focused and less time-consuming for all concerned.

**Request 22: Telephone Records**

This request sought three telephone bills – April through June of 2005 – for cell phones or pagers used by the two individual defendants, Lauren Matarese and Frank Brancato. As stated in the Plaintiff's original Memorandum in support of the Motion to Compel, "in light of the discovery that someone accessed the RILETS/NCIC database to run a background check on Mr. Mauti the day before his custodial arrest for a minor traffic offense, the plaintiff believes that the actions of the defendants may have been influenced, in part, by others." The testimony from Corporal Lachapelle that a number of the Department's patrol supervisors drew the same inference he did - that Mr. Mauti's arrest was "a favor" from Matarese to Hopkinton's chief John Scuncio - shows this Request to be anything but a "fishing expedition."

For the reasons stated above, the Motion to Compel should be granted in its entirety.

**Charles Mauti**
By his Attorneys,

/s/ John R. Harrington
John P. Gyorgy 3560
John R. Harrington 7173
NOEL & GYORGY LLP
50 South Main Street
Providence RI 02903
(401) 272-7400
(401) 621-5688 (Fax)

## CERTIFICATION

I hereby certify that on October 5, 2006, I sent a copy of the foregoing document to the following counsel of record by electronic noticing through the Court's ECF system:

Michael J. Collucci, Esq.
Olenn & Penza
530 Greenwich Avenue
Warwick RI 02886

/s/ John R. Harrington