UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLES MAUTI :
:
VS. : C.A. NO.: 06-61T
:
LAUREN MATARESE, ET AL. :

DEPOSITION OF DAVID LACHAPELLE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Noel & Gyorgy, LLP, 50 South Main Street, Providence, RI, on September 12, 2006 at 10:00 A.M.

PRESENT:
FOR THE PLAINTIFF............ NOEL & GYORGY, LLP
BY: JOHN P. GYORGY, ESQUIRE

FOR THE DEFENDANT............ OLENN & PENZA, LLP
BY: MICHAEL COLUCCI, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

may have access to information that you don't have access to?
A. That's correct.
Q. But you can go into the IMC database and get a year's worth of arrests by the department?
A. Yes.
Q. What kind of form does that information come back to you in? What does it look like, how much information do you get about a particular arrest?
A. The name of the person. The arrest number. The charge. It will have the subject's birth date. I believe it has a Social Security number in there and also the offense date.
Q. Anything else?
A. I am not sure if the arresting officer is on there.
Q. When you said arrest number, can you take the arrest number and go pull a report?
A. Yes.
Q. I should not have said, and go pull a report. Can you take an arrest number and call up that specific arrest report from

the computer?
A. Yes.
Q. When you call up a specific arrest report, in what form does it come up? Is it a picture of the actual document or is it a screen that contains the same information as the report might?
A. I don't know what you mean by picture.
Q. You can scan a document into a computer and actually call up a photograph of the piece of paper.
A. It would be the actual computer-generated report, not a picture.
Q. Does the computer-generated report contain the same information that the physical report, that the paper report contains?
A. Yes.
Q. Does it contain the officer's narrative?
A. Yes.
Q. Will it contain the results of the BCI check, for example?
A. No.
Q. So when you refer to, as you did earlier, to the arrest package, that arrest package for a particular arrest will be a different

collection of documents or information than the computer-generated arrest report; is that right?

A. Yes.

Q. There will be more in the physical arrest package than there would be simply in that report in the computer?

A. Yes.

Q. When you said the report for any particular arrest in the IMC database will include the charge, in what form does it tell you what the charge is?

A. Form one.

Q. Does it say trespassing, or does it have a statute section, for example?

A. It will have the word, trespassing, disorderly, it has an actual word in it.

Q. So there is a description of the offense, not a statutory number?

A. I am not sure if the statute number prints with it. I know it has the actual verbiage for the charge.

Q. With respect to traffic offenses, how specific does that description get?

A. Are we talking still about arrests?

Q. Yes.
A. Traffic offenses, unless they are criminal, will not show up on that.
Q. Where would you find traffic offenses that are not criminal, or would you find that in the IMC database?
A. The same. If you are looking for a specific person, by person; a specific summon numbers, by number; certain date, by date. There are many ways to get a traffic citation information.
Q. Can you do the same thing with traffic citations that you can do with arrests? When I say you, I am talking about you as a supervisor. Could you call up on the computer a year's worth of traffic offenses?
A. Yes.
Q. Without breaking them down by name or date or the other factors you mentioned?
A. As far as everybody's data that received a ticket, is that what you are saying? The arrest has the name, traffic --
Q. Let me see if I can be more clear. I think

I understand why I am confusing you. Go back to the report that you can get from the IMC database, a year's worth of arrests, are you going to see a screen that you can scroll through that has 250 names with the dates and the arrest reports? Are you going to see a column, a list of arrests by name with the other information, like arrest report?
A. You have lost me.
Q. I was trying to help find you. If you get a report from the computer of a year's worth of arrests, what information is displayed on the screen?
A. It depends on how you asked the computer.
Q. How you asked the computer to sort it?
A. Correct.
Q. Does your inquiry, for example, say, give me a year's worth of arrests listed by name?
A. I don't believe that is an option.
Q. What are the options?
A. Time frames and charges.
Q. You can ask it to give you every arrest for

breaking and entering over the past year?
A. Yes.
Q. Can you go back further than a year?
A. As far as IMC is on line, I couldn't tell you how many years we had it.
Q. Do you have any idea, I know it is Paul Perrone.
A. He has not been here for the whole IMC. The minimum would be four years, possibly more, possibly five.
Q. That the IMC database has been maintained?
A. Yes.
Q. Have you been able as a supervisor to access it for that long of a period?
A. Yes.
Q. Going back to what the data looks like when you are doing a search over a one-year period, I am using that one-year period as an arbitrary cutoff, it could be one year or it sounds like it could be up to four. You said you can search by offense, what other factors can you search by?
A. Priority, shift. There are numerous.
Q. Can you do a search that includes every shift, every offense, every officer?

A. Yes.
Q. If you do such a thing, what does the printout look like?
A. Every arrest for every shift for four years?
Q. Yes.
A. I have never done it. I can't you tell you what it looks like.
Q. Have you done that for a shorter period?
A. I have done the check for a year, arrests for a year.
Q. Without limiting the factors that you are searching by?
A. I limited it to, list by patrol officers.
Q. So it is really how you are sorting the information?
A. Yes.
Q. So you get the same data back if you sort by patrol officer, it is just it comes back to you with the entries under each officer's name, right?
A. No. It would have the first person in the alphabet hired by the police department on top. All of the offenses across the top

and a number and how many offenses he has been arrested in each block alphabetically.

Q. So you are really looking at a summary of the information of an officer's performance?

A. Yes.

Q. And can you then go to that particular officer, go to a particular offense, and get the details on those arrests?

A. Yes.

Q. It would go from the first letter in the alphabet, senior officer with the last name beginning the that letter?

A. Not senior. Whoever started with an A.

Q. You would have a column across the page for each officer sorted alphabetically by officer in the left column?

A. Yes.

Q. And as far as you know, although you have only done that for a one-year period, you could do that, as far as you know, for a four-year period?

A. Yes.

Q. Could you do, could you get the same form of report for traffic offenses, noncriminal

traffic offenses, by officer?
A. Yes.
Q. How long would it take you to run that report for a one-year period?
A. It depends on the computer. The one-year arrest actually was less than five minutes on the computer.
Q. Based on your experience, if you asked for a report for traffic citations for the same period, would you get more information back or less?
A. In the format by officer?
Q. By officer. The same form of report except the first one is for criminal offenses and the second one is for noncriminal traffic offenses.
A. There would be more because there are more traffic offenses.
Q. Okay. I don't want to assume these things, but I am glad to hear there are more traffic offenses than criminal offenses. Do you have any -- have you ever had occasion to run that type of summary report on traffic offenses?
A. Yes.

Q. For what period of time have you covered when you have run that kind of report?
A. Recently I have done it from January 1 to the end of July.
Q. Was that for every officer in the department or a specific shift?
A. Every officer.
Q. Was it sorted by officer as you were discussing earlier?
A. Alphabetically.
Q. How long did it take the computer to generate that report?
A. Less than five minutes.
Q. Did you print the report?
A. No.
Q. How did you review the report?
A. On the computer screen.
Q. By looking at the screen?
A. Yes.
Q. Did you review the whole report on the screen?
A. Yes.
Q. How long did it take you to review the report on the screen?
A. Not long.

Q. How many screens did you have to go through, can you estimate that?
A. Just one.
Q. When you say just one, did you have to scroll down?
A. Side to side.
Q. How many officers are there in the department?
A. I don't know exactly.
Q. Let me ask maybe a better question. How many officers would there have been information for on that screen where you got seven months worth of traffic citations?
A. All full-time officers, from the Chief to the lowest patrolman.
Q. Did they all issue citations or were there people on there for whom there was a row of zeros across the top?
A. There were zeros.
Q. How many of the officers in the department -- can you estimate for me how many of the officers in the department there were no traffic citations issued?
A. I can guarantee there was one.

You can answer.
A. Not as a matter of routine.
Q. When will it be given or not given?
A. If you question a subject about a crime, there will be Miranda rights.
Q. And if you are not going to question them, no Miranda warning?
MR. COLUCCI: Objection. You can answer.
A. Right.
Q. Do you remember the circumstances of Mr. Mauti's arrest last May?
A. Yes.
Q. Tell me what you remember about it?
A. I was supervising the third shift, midnight to eight. I was sitting at my desk. I heard Captain Matarese on the radio making a traffic stop. I don't remember what the place was or if she was actually calling out with it, I just know it was a traffic stop. She made another radio transmission running a check on, I assume, operator or somebody in the vehicle. I didn't hear the name. It was just background noise that you are used to

of people talking on the radio. And my dispatcher at that time was Michael Fay. And I heard Dispatcher Fay's transmission as nothing found in Rhode Island as far as a license, but active in Arizona. I again filtered out the background noise. And Dispatcher Fay came to me and said, do you know who that is she just ran? I said no, Michael. Who is it? And he told me the name of Mauti. And I said, who is he? And he told me that he is somebody from Hopkinton who is having problems up there and he works for the town. I said, okay. That was about the end of our conversation right then. Then I heard Captain Matarese on the radio again asking for a transport officer. Dispatcher Fay sent officer Brancato to the Captain's location. And then I went into the dispatch area and asked Dispatcher Fay, who is she transporting? And he told me he did not know. So I confirmed with him what I heard. I said, is it this Mauti person she ran? He said, I don't know if that is who is being brought in. I asked Michael, does

he have a license? He said that he had an active license in Arizona but nothing on file in Rhode Island. I said, okay. And I went back to my desk and waited for the Captain.

Q. Who then came to the station?

A. Captain Matarese.

Q. Did she?

A. Yes.

Q. How soon after the last part of your discussion with Michael Fay?

A. Under five minutes.

Q. When did Officer Brancato arrive?

A. I am not sure of the exact time.

Q. So Captain Matarese came back first?

A. As far as I know. She was the first person I saw.

Q. Did you discuss with her Mr. Mauti's arrest?

A. Yes.

Q. Who initiated that discussion, did you ask her about it or did she come in and tell you about it?

A. I asked her.

Q. What did you say to her?

A. I asked, what he is being charged with?
Q. What did she say?
A. Driving without a license.
Q. Without forcing me to say, what did you say and what did she say, can you repeat as best you remember what each of you said, not summarizing it, but if you can remember what the form of what people were saying, fine. If you have to describe the substance, it was a long time ago, I recognize, but what she said and what you said. What did you say in response to driving without a license?
A. I said, he has an active Arizona license. She replied, well, he does not have a Rhode Island license and he has lived in Rhode Island for more than 30 days. I said, okay. Normally we just write an RITT summons for that and not bring them in.
Q. RITT being Traffic Tribunal?
A. Rhode Island Traffic Tribunal.
Q. What did she say?
A. It is an arrestable offense and people get arrested for it all of the time. I

said, I personally cannot remember
arresting anybody for that offense.
Q. And what did she say?
A. She said it is in the statute. We have
a book shelf there with the law books and
she picked up the law book and turned to
31-10-1.
Q. Did she show it to you, did she read it
herself?
A. She read it herself. She showed it to
me and where she pointed out she said, that
covers this particular situation with not
having a Rhode Island license.
Q. When you say that covers this particular
situation and you were pointing with your
finger on the table, was she pointing to
31-10-1?
A. That statute, yes.
Q. And what did you say?
A. I read it. I said, okay.
Q. Was that the end of the discussion?
A. Pretty much.
Q. When you say pretty much, was there some
small part of it, did she say something
else?

A. I said, I never arrested anybody for that. I have given them an RITT motor vehicle violation.
Q. Do you know of anyone else in the department who has ever arrested someone for violating that statute without there being some other offense?
A. Well, that statute --
MR. COLUCCI: Objection. You can answer.
THE WITNESS: People have been arrested for that.
Q. For violating 31-10-1?
A. Yes.
Q. Let me ask it a different way. Are you aware of any other custodial arrests of anyone in Westerly for not having a Rhode Island license if they had an active license from another state?
A. I have no knowledge of that.
Q. Did you have any further discussion with Captain Matarese that morning?
A. Not that I can recall.
Q. Did you have any discussion with her about Mr. Mauti's arrest subsequent to that

A. You said it was a memo.
Q. Do you remember how long that document stayed in the roll call binder?
A. It was probably a few weeks.
Q. What was the document?
A. The RITT schedule that changes traffic laws and fines.
Q. Is that something published by Traffic Tribunal?
A. Yes.
Q. Do you remember during the period that document was in the roll call binder, if it ever prompted a discussion about what happened to Mr. Mauti?
A. No, not that document.
Q. Was there anything else that prompted a discussion at roll call about Mr. Mauti's arrest?
A. I don't recall.
Q. Did you discuss Mr. Mauti's arrest at any time last May with anyone else in the department other than Captain Matarese?
A. Yes.
Q. With whom?
A. The day shift supervisors that were

relieving me that morning.
Q. Who were they?
A. Sergeant Lacey.
Q. What is Sergeant Lacey's first name?
A. Shawn.
Q. Was there another first shift supervisor?
A. Sergeant Stono Trombino (phonetic).
Q. Did you have discussion with Sergeant Trombino and Sergeant Lacey, did you have a discussion with both of them at the same time?
A. Yes. They were changing into their uniforms.
Q. Is that typical, that as the shift supervisor is leaving you will have a conversation with the shift supervisors coming in?
A. Yes.
Q. Is that part of the roll call?
A. Not roll call, just shift change.
Q. Was it a discussion among you three or was someone else there?
A. I just remember those two.
Q. Were all three of you present for the entire discussion?

A. Yes.
Q. What did you tell them about Mr. Mauti's arrest?
A. That he was being processed by Officer Brancato and I have been advised by the Captain he would be released with a summons so there's no one to bring to court.
Q. No one to transmit to court that day?
A. Yes.
Q. Did you tell them the circumstances of the arrest?
A. Just that it was a car stop.
Q. Did you tell them it was a license offense?
A. Yes.
Q. Did you explain to them that it was a license offense where Mr. Mauti was arrested because he did not have a Rhode Island license?
A. Yes.
Q. Did you tell them that he did that have what you called an active Arizona license?
A. Yes.
Q. Did you tell them about your discussion with Captain Matarese?
A. Yes.

Q. What was Sergeant Lacey's reaction to what you told him about Mr. Mauti's arrest?
A. He felt as I did, it was an RITT offense.
Q. It was a Traffic Tribunal offense?
A. Yes.
Q. Did you say anything about prior arrests or prior tickets for that offense?
A. That is two separate things.
Q. You are right. Did either of them, did he say anything about the knowledge of anyone ever having been arrested for that offense?
A. Did he say, no, I don't believe he did.
Q. Did he express surprise that Mr. Mauti had been arrested instead of receiving a ticket?
A. Yes.
Q. What about Sergeant Trombino?
A. Same effect, surprise that he was arrested.
Q. Was it a surprise that he had been arrested because of the nature of the offense?
A. Yes.
Q. Did either of them -- do you know when the last time prior to that was that you're

aware that Captain Matarese had conducted a traffic stop?
A. No, not exactly. She does make them.
Q. She does make them?
A. Yes. I have heard of her making them in the past, yes.
Q. Did Sergeant Lacey or Sergeant Trombino say anything else in response to what you told them about Mr. Mauti's arrest?
MR. COLUCCI: Can you we take a five-minute break.
MR. GYORGY: Let him answer the question.
(QUESTION READ BACK)
A. Yes. They said something.
MR. GYORGY: Off the record.
(OFF THE RECORD)
MR. GYORGY: Back on the record. Read back the last question and answer.
(LAST QUESTION AND ANSWER READ BACK)
Q. What did Sergeant Lacey say?
A. As far as about the Mauti arrest?
Q. Yes.
A. He asked me if I knew who Mr. Mauti was

and I said no.
Q. What did he tell you?
A. He told me that he works with the Town of Hopkinton in some capacity. I don't remember the exact words.
Q. Is that all he said?
A. He worked for the Town of Hopkinton and something to the effect, I don't know the exact words, that he has a problem with the Town of Hopkinton or something of that nature. I don't remember the exact wording of it.
Q. Did he say anything about the police chief in Hopkinton, Chief Scuncio?
A. He mentioned Chief Scuncio's name.
Q. Do you know why he brought that up? Do you remember why he brought that up? Did he say why he mentioned that?
A. He said Mr. Mauti and Chief Scuncio had an internal problem going in Hopkinton, something about zoning or properties. I was not really paying attention.
Q. Did he suggest at that Mr. Mauti's arrest had something to do with that?
A. No. I would not say he made a

suggestion, he just brought up the fact.
Q. Did anybody say anything about the arrest being related to Mr. Mauti's disagreements with Chief Scuncio, any of the three of you, yourself, Sergeant Lacey or Sergeant Trombino?
A. I don't know which one, but there was a reference to that, because of Chief Scuncio. I don't know which Sergeant.
Q. When you are saying there was a reference to it, when you referred to making reference to it, are you saying someone made reference to the arrest or the possibility that Mr. Mauti's arrest that morning had something to do with his dispute with Chief Scuncio?
A. Yes.
Q. Was it either Sergeant Trombino or Sergeant Lacey?
A. They were the only two in the room, so one of them must have.
Q. It was not you who suggested that possibility, it was one of the two of them?
A. Yes.
Q. Was there any discussion of that

possibility after the suggestion was made?
A. Yes.
Q. Tell me about that suggestion?
A. Whichever one said that to me, that Mr. Mauti and Chief Scuncio had a problem with each other in the Town of Hopkinton and that they felt, whichever one said it, that she was probably doing Scuncio a favor. That is not my business.
Q. Did you understand -- whoever said that, did you understand them to mean that Mr. Mauti's arrest was made at the request of Chief Scuncio?
A. Well, I would not use request.
Q. What would you use?
A. I would use as a favor.
Q. Do you know whether or not Captain Matarese ever discussed Mr. Mauti's arrest with Chief Scuncio?
A. I don't know.
Q. Do you know whether Captain Matarese knows Chief Scuncio?
A. I am sure she does. I don't know personally.
Q. Why are you sure she does?

Q. What did you say to Officer Brancato about the charge?
A. That it was the wrong charge. That normally in that situation, as far as myself and the officers I have seen, you just use the RITT summons. It is not an arrestable offense.
Q. What was Officer Brancato's reaction?
A. He agreed. He was a quiet guy.
Q. Did you tell Officer Brancato that in your role as supervisor to provide him with guidance for future use?
A. I am always his supervisor because I outrank him.
Q. I'm sorry. Of course. But did you tell him that in terms of instructing him for future reference that this is not an arrestable offense, or were you voicing an opinion without having an occasion to do so as his supervisor?
A. I think both. One, it is a learning curve for him, and two, since there had been no disposition on the case at that point I could have been wrong and it is a nonarrestable offense if the judge saw it

that way. It was a learning curve for both of us.

Q. Do you remember anything else he said in response?

A. No.

Q. On the first occasion, did you say that he saw it the same way you did in terms of whether it was an arrestable offense?

A. I missed the first part of that.

Q. I am going back to something you said just a couple of minutes ago. When you brought up the subject of whether the violation of 31-10-1 is an arrestable offense, when you brought up that subject with Officer Brancato, did you say that he agreed with you that it was a Traffic Tribunal offense and not an arrestable offense?

A. I don't know if he agreed or disagreed with me. I don't believe he disagreed with me. He probably just nodded his head.

Q. Did he say anything about the circumstances of Mr. Mauti's arrest in that conversation or subsequently?

A. He was not happy about being called to transport Mr. Mauti.

Q. How did express that?
A. He said, how come I had to do it? Next available officer.
Q. Did he say anything else about why he was unhappy about being the one to have to transport?
A. No. Just the extra work itself.
Q. Extra work at the end of his shift?
A. Yes.
Q. Did you ever discuss Mr. Mauti's arrest with any other senior officer besides, I think you mentioned the three sergeants and Captain Matarese; is that correct?
A. Yes.
Q. Did you have discussions with any other senior officers about Mr. Mauti's arrest?
A. Yes.
Q. Who?
A. Sergeant Michael Gulluscio. Sergeant Robert Warner.
Q. Anyone else?
A. I don't think so, not being superior.
Q. What about anyone at your rank or junior.
A. Corporal Green, who is on my shift.
Q. He is on your shift?

A. Yes.
Q. And his first name?
A. Robert.
Q. Anyone else?
A. Probably quite a few people.
Q. Can you remember any other names?
A. Not specifically or in detail.
Q. Can you remember anyone you did not talk to about -- did you talk to any of the lieutenants about this?
A. I don't think I did. I don't think I mentioned it to the Chief.
Q. Did you have any conversation with Captain Matarese subsequent to the day of the arrest about the arrest?
A. No, I don't believe I did.
Q. The first sergeant you mentioned, Michael Gulluscio, when did you talk to him about it?
A. I can't remember dates. It has been over a year and a half. I just can't remember dates. You can ask me that a hundred times and I cannot give you a date.
Q. The next question I always ask is was it closer in time to last May or closer in

time to today that you discussed this with Sergeant Gulluscio?
A. I would say closer to last May.
Q. Do you remember anything about the substance of your discussion with Sergeant Gulluscio?
A. Just the arrest itself.
Q. Was the substance of the discussion similar to the discussions you have had with Sergeant Lacey and Sergeant Trombino?
A. Yes.
Q. Did Sergeant Gulluscio express an opinion one way or the other agreeing with your view of whether it is an arrestable offense or not?
A. I don't recall.
Q. Did you have a discussion either with Sergeant Gulluscio, Sergeant Warner or Corporal Green where the subject of possible motives for Mr. Mauti's arrest came up?
A. It was discussed. I don't know by who. I could have mentioned that was brought to me by Sergeant Trombino or Sergeant Lacey, that they fell it was as a favor to

Chief Scuncio.
Q. Was your answer with reference to a conversation with one of the three officers I just mentioned, Sergeant Gulluscio, Sergeant Warner or Corporal Green?
A. Yes.
Q. Do you remember whether any of the three of them responded to the suggestion of motive being a favor to Chief Scuncio?
A. I couldn't say if they agreed or disagreed with it.
Q. Of all of the people you talked to, do you remember anyone agreeing or disagreeing with that suggestion?
A. I think it was a general consensus from all that they agreed.
Q. That they agreed that that was the motive for Mr. Mauti's arrest?
A. For Chief Scuncio, as a favor to Chief Scuncio, yes.
Q. When you say there was a general consensus, who would you include in that general consensus, Sergeant Trombino and Sergeant Lacey?
A. Yes.

Q. Sergeant Gulluscio and Sergeant Warner and Corporal Green?

A. I don't know about Corporal Green.

Q. But the two sergeants?

A. Yes.

Q. That is at least four people?

A. Yes.

Q. Anyone else that you would say agreed that that was the likely motive for Mr. Mauti's arrest?

A. There are a lot of people in that building.

Q. I understand.

A. I can't give their opinions and whether they agree or disagree.

Q. That is a fair answer. I am just asking if you could remember any specific individuals and your answer is you cannot?

A. My sergeants felt it was that way.

Q. Which sergeants, these two?

A. Yes.

Q. Sergeant Williams?

A. He really did not give an opinion.

Q. Of any of those four people, do any of the four of them, to your knowledge, know Chief

Scuncio, know him well?
A. Yes.
Q. Which ones?
A. I would say all of them.
Q. Because he is the chief in a neighboring town?
A. Yes.
Q. Do you have an opinion as to whether that it is possible or likely -- let me ask one at a time. Do you think that Mr. Mauti's arrest was done as a favor to Chief Scuncio?
MR. COLUCCI: Objection. You can answer.
A. In my opinion, I would have to say yes.
Q. And you say, I would have to say yes, why do you have to say yes?
A. Because I have no knowledge of Mr. Mauti prior to this incident. And apparently a lot of people do. And I got the impression that Mr. Mauti and Chief Scuncio are not the best of friends. So in my opinion, did one hand wash another, that could possibly be.
Q. Is it also in part because of the

circumstances of Mr. Mauti's arrest?
A. What do you mean circumstances?
Q. Captain Matarese is the senior ranking officer in the department?
A. No, the Chief is.
Q. Next to the Chief?
A. Yes.
Q. There is one captain?
A. One captain.
Q. Is it unusual for her to make traffic stops?
A. She has made them in the past.
Q. I understood you to say that earlier. Still, is it out of the ordinary for Captain Matarese to conduct traffic stops?
A. Usually when she is making a traffic stop, she has a good reason of why she made one.
Q. Would a good reason be somebody blowing a stop sign?
A. If it happened in front of her and almost caused an accident, yes.
Q. Did you say your last ticket was someone blowing a stop sign that almost hit your cruiser?

A. Yes.
Q. And you are not aware of anyone in the department ever make a custodial arrest for the offense that Mr. Mauti was charged for; is that correct?
A. To my knowledge.
Q. Those are the circumstances I guess I am asking you. Whether they are unusual enough that the motive would suggest, either suggested to you initially by Sergeant Lacey, or Sergeant Trombino, makes more sense than any other; is that accurate?
A. That her motivation was to --
Q. That she had a motivation other than keeping the roads safe for the rest of us drivers?
A. In my opinion, yes.
Q. Do you know whether anyone ever asked Chief Scuncio about it?
A. I don't know.
Q. Do you have a designated supervisor? Is there one person who is your designated supervisor or does it vary according to who is on duty?