UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

**CHARLES MAUTI,**

**v.** **CA NO. 06-61T**

**LAUREN MATARESE, ET AL.**

## PLAINTIFF'S OBJECTION TO MOTION FOR SUMMARY JUDGMENT

For the reasons stated in the attached Memorandum in Support, the Affidavits of Charles Mauti and Lise Gescheidt, and the accompanying Exhibits, Plaintiff Objects to the Motion for Summary Judgment filed by the Defendants.

Charles Mauti
By his Attorneys,

/s/ John P. Gyorgy_______________
John P. Gyorgy No. 3560
John R. Harrington No. 7173
Noel & Gyorgy LLP
50 South Main Street
Providence, Rhode Island 02903
(401) 272-7400
(401) 621-5688 (Fax)
JPGyorgy@LawNoel.com
JRHarrington@LawNoel.com

**Certification**

I hereby certify that on January 19, 2007, I sent a copy of the foregoing document to the following counsel of record by electronic noticing through the Court's ECF system:

Michael Collucci, Esq.
Olenn & Penza
530 Greenwich Avenue
Warwick RI 02886

/s/ John P. Gyorgy_______________

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**CHARLES MAUTI,**

**vi.** **CA NO. 06-61T**

**LAUREN MATARESE, ET AL.**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF OBJECTION TO MOTION FOR SUMMARY JUDGMENT**

**Introduction**

There are several factual and legal premises central to the defendants' summary judgment motion that do not withstand even cursory scrutiny. Unless the Court accepts ***all*** of them, the Motion must be denied; for the reasons discussed below, the Court should not accept ***any*** of them. Among the very basic defects of the motion are the following:

1. The version of events offered as the factual premise for the motion in the Defendants' supporting Memorandum is contradicted by *all* of the evidence – both the records of the Westerly Police Department ("WPD" or "Department"), as well as by the statements of its officers, including (but certainly not limited to) statements by the individual defendants Lauren Matarese and Frank Brancato.

2. The version of events offered in the supporting Memorandum is also unsupported and even contradicted by the one Affidavit submitted, that of Defendant Matarese. The facts argued by counsel as justifying her traffic stop are not even found in the Defendants' own Statement of Undisputed Facts.

3. The Defendants reliance on the "related crimes" variant of the qualified immunity defense ignores the scope and purpose of the doctrine, which by definition requires two crimes, with the same elements. Defendants have

conceded that the basis of Mr. Mauti's arrest – R.I.G.L. § 31-10-1 – is not even a crime.

4. In discussing the factual basis required to justify a traffic stop, the Defendants rely on legal authorities that were effectively overruled by the United States Supreme Court nearly thirty years ago in *Delaware v. Prouse*, 440 U.S. 648, 662-63 (1979).

5. Judicial estoppel should be applied to prevent the Defendants from relying on R.I.G.L. § 31-11-18 as the "related" crime to support their assertion of a qualified immunity defense, since they earlier in the case refused discovery regarding any traffic offenses other than R.I.G.L. § 31-10-1, on the stated ground that all of the other sections of Title 31 were irrelevant. The Court accepted the Defendants' previous position and precluded discovery on the very defense that is the basis of the summary judgment motion.

6. The only document offered to support the claim that Defendant Matarese considered arresting Mr. Mauti for a different offense is a never-disclosed fingerprint card that was required by court order and statute to be destroyed after dismissal of the criminal case brought against Mr. Mauti. A prior decision of this Court directly on point precludes the use of this document as evidence on that basis. *Coalition of Black Leadership v. Doorley*, 349 F. Supp. 127 (D.R.I. 1972)

**Factual Background**

The Defendants' Motion for Summary Judgment begins with a three page "STATEMENT OF FACTS" that contains not a single reference to one piece of evidence in the record. It does not refer even once to the Affidavit of Lauren Matarese – the only Affidavit submitted to support the motion for summary judgment – and no attempt is

made to tie it to the Statement of Undisputed Facts. Such references may be lacking because the description given by Defendants' Memorandum of the circumstances of Mr. Mauti's arrest, and specifically the facts that it argues justified Matarese pulling Mr. Mauti over in the first place, differ markedly from what Defendant Matarese said at the time of the arrest nearly two years ago.

The most glaring example is the anonymous construction worker mentioned on page 2 of the Memorandum. According to the arrest report, a document she prepared when her memory was fresher, and which she was trained to make complete and accurate, [1]Matarese said only the following:

> While returning from the gas pump, I was traveling on Grove Ave in the construction zone, when a worker motioned about a vehicle that had just passed him. I turned around and stopped RI Reg. P-712 on High Street.

Exhibit C, at 2 (Arrest Report). Her report says nothing more about the construction worker or about her reasons for stopping Mr. Mauti. She repeated the same version ten days later to Mr. Mauti's counsel at the arraignment, with one material addition. This is how Matarese described the stop to Lise Gescheidt on May 20, 2005:

> As she was driving through a construction area, a construction worker pointed to Mr. Mauti's car. She did not recognize Mr. Mauti or his car, and ***did not observe any traffic or motor vehicle violations in her presence***. She did not have any conversation with the construction worker before stopping Mr. Mauti's car, and ***she did not know why he pointed at it.***

Exhibit B (Affidavit of Lise Gescheidt, ¶ 4(a) and (b)) (emphasis added). In short, Matarese specifically said within days of the arrest that (1) she saw nothing herself to suggest any traffic offense, and (b) she attached no significance to the gesture of the construction worker other than it was directed towards Mr. Mauti's car.

[1] Exhibit E (Matarese Deposition, p. 28, ll. 2-4, p. 41, ll. 4-19, p. 29, ll. 16-20, p. 32, ll. 22-25, p. 33, ll. 1-2)

The absence of any other facts to justify the stop of Mr. Mauti was confirmed by the legal Memorandum filed the following week by the Town's counsel in response to a request from Judge Erickson. Despite a pending Motion to Suppress challenging the existence of probable cause, Exhibit Q, the Town filed a Memorandum that described the stop in the exact language of Matarese's report, adding nothing more about either the construction worker or Materese's own observations. Exhibit R (State's Memorandum Regarding Defendant's Motion to Dismiss).

The version of events given by Matarese in her Affidavit offered in support of the summary judgment motion in this case contains new facts that are inexplicably absent from the contemporaneous record (including her own arrest report). The consistency of the contemporaneous versions in the arrest report, in her statements to Mr. Mauti's counsel, and in the Town's written submission to the state court, when taken together with her testimony concerning her memory and her training to make sure reports were complete, casts serious doubt on her Affidavit and clearly presents a series of factual issues that are material to the qualified immunity defense. But even were the Court to accept her Affidavit as true, it would not justify the stop.

In paragraph 9 of her Affidavit, Matarese adds new details to the actions of the anonymous construction worker, then concludes by saying that those actions "caused me to suspect that there may have been ***some type of problem/motor vehicle infraction*** involving the vehicle that the worker was pointing to." *Id.*, ¶ 4. The Defendants' Memorandum uses a slightly different but clearly disjunctive phrase: "some sort of problem or potential infractions." Defendants' Memorandum at 2. Matarese was asked at her deposition whether the phrase "***some type of problem/motor vehicle infraction"***

meant 'problem and motor vehicle violation' or instead meant 'problem or motor vehicle violation.' Her response was "I would say it is an and/or[,]" effectively eliminating any significance of the newly revealed actions of the construction worker in terms of whether Matarese had any reason, much less knowledge of facts that would support a reasonable suspicion that a crime had been committed, to stop Mr. Mauti's car. Exhibit E (Matarese Deposition, p. 170, ll. 18-25, p. 171, ll. 1-4). For purposes of the summary judgment motion, what is important is that ten days after the arrest, at the state court arraignment, Matarese said that she did not know *why* the worker pointed at the car.

The few facts surrounding Mr. Mauti's arrest that *are* undisputed do not go far beyond the fact that on May 10, 2005, Captain Lauren Matarese, the second ranking officer in the Westerly Police Department, stopped Plaintiff Charles Mauti as he was driving from his home in Westerly to his job as Hopkinton's Building and Zoning official. Matarese then arrested Mr. Mauti for violating R.I.G.L. § 31-10-1, which requires Rhode Island residents to get a Rhode Island drivers license within thirty days of moving to the state. When he was stopped, Mr. Mauti presented to Matarese an active valid driver's license issued by the State of Arizona, where he had lived before moving to Rhode Island.

**There Was No Reasonable Suspicion Justifying Stopping Mr. Mauti. Nor Was There Probable Cause To Arrest Him After the Stop, Since the Offense Charged Is Not A Crime**

As noted earlier, the Defendants' Memorandum takes the completely untenable position that that Mr. Mauti (or anyone else) can be stopped on the basis of something far short of the standard established by the Supreme Court in cases such as *Delaware v. Prouse,* 440 U.S. 648, 662-63 (1979), and *United States v. Cortez*, 449 U.S. 411, 417 (U.S.

1981). At pages 9-10 of their Memorandum, Defendants rely on several Rhode Island cases for the proposition that "Rhode Island law has long permitted routine traffic stops for the purpose of checking for a proper license and registration." To the contrary, since the Supreme Court's 1979 decision in *Prouse* the rule has been that "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Id.,* 440 U.S. at 663.

The Fourth Amendment requires that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (U.S. 1981).[2] The courts look at the "totality of the circumstances -- the whole picture" and "[b]ased upon that whole picture the detaining officers must have a *particularized and objective basis for suspecting the particular person stopped of criminal activity*." *Id.* at 417-418 (emphasis added). If one accepts Matarese's contemporaneous version of events as stated in the

[2] *Cortez* clearly overrules earlier RI cases allowing police officers to stop automobiles and check licenses/registrations at will. *See State v. Rattenni*, 117 R.I. 221, 224 (R.I. 1976) ("Moreover, it is completely within an officer's power to stop a car for a license and registration check. General Laws 1956 (1968 Reenactment) §§ 31-3-9, 31-10-27; State v. Maloney, 109 R.I. 166, 283 A.2d 34 (1971). Consequently, the police were justified in making the initial intrusion.); *State v. Maloney*, 109 R.I. 166, 173 (R.I. 1971) ("We think it clear that reference to "Every license" in the Rhode Island statute has reference to the operator of a motor vehicle found to be operating on any of the public highways of this state. Indeed we think that under this section it is the duty of peace officers to make such checks to insure compliance with the licensing law to the same extent as they are charged with enforcing compliance with all the laws of this state. Inconvenience to the properly licensed operator is a part of the price he pays for the maintenance of safe and orderly travel on the highways.")

arrest report as true, she had no factual basis – not to mention a "particularized and objective one" – for suspecting criminal conduct by Mr. Mauti. Even her current Affidavit with the anonymous construction worker's now-expanded *repertoire* of body language and hand signals, leaves her able to say no more than that she suspected "some type of problem/(*sic*)motor vehicle infraction." Matarese Affidavit, ¶ 4. That would not be enough even it was true. But in the face of her statement in May of 2005 that she didn't know *why* the worker pointed at the car, her Affidavit is far short of the mark necessary to support summary judgment.

After denying it in their Answer, and then attempting to dodge the issue in response to Requests to Admit, the Defendants finally concede that the statute that Mr. Mauti was arrested and prosecuted for violating – R.I.G.L. § 31-10-1 – is not a crime at all, but rather a civil violation. Memorandum in Support of Defendants' Motion for Summary Judgment, p. 5); Exhibit H (Transcript of Hearing on Plaintiff's Motion to Compel Production of Documents, October 13, 2006, p. 36.[3] It follows that they had no authority to *arrest* Mr. Mauti, *regardless* of whether there was reasonable suspicion justifying stopping him or probable cause to arrest him in the first place, since probable cause to arrest someone for a civil violation is an oxymoron. *See, e.g., State v. Frazier,*

---

[3] Section 31-10-1(a) requires that a person obtain a Rhode Island drivers license within thirty days of becoming a resident of the state. The section itself contains no penalty provision, which brings it within the terms of section 31-27-13(a):

> It is a civil violation for any person to violate any of the provisions of chapters 1 -- 27 or chapter 34 of this title, unless the violation is by these chapters or other law of this state declared to be a felony or a misdemeanor, or unless the offense is punishable by a fine of more than five hundred dollars ($500) or by imprisonment.

Since section 31-10-1 is *not* classified as a misdemeanor or a felony, and itself contains no penalty provision, § 31-27-13(a) makes it a "civil violation."

421 A.2d 546, 549-550 (R.I. 1980) (missing license plate could not create probable cause for arrest since, *inter alia*, "a missing license plate is a 'violation' for which a citation would be issued to the operator for subsequent disposition within the framework of the Department of Transportation's Administrative Adjudication Division") (footnotes omitted); *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law.").[4]

It turns out that despite the early denials and evasive responses, Mr. Mauti was never alone in his view that the nature of the charge made his arrest and subsequent misdemeanor prosecution in state district court illegal. Two of the Department's patrol supervisors, Corporal David Lachapelle, the shift supervisor at the time of the arrest, and Sergeant Shawn Lacey, who handles Rhode Island Traffic Tribunal prosecutions for the Department, both testified that a violation of § 31-10-1 is *not* an arrestable offense, but should instead be handled by issuing a Traffic Tribunal summons. Exhibit G (Lachapelle 75-77, 80-81, 91).[5] Notably, Corporal Lachapelle told Defendant Matarese just that when she arrived at the station after arresting Mr. Mauti, before she had commenced the misdemeanor prosecution on the same charge in state district court. She disagreed with him, responding (in his words) that "people get arrested for it all the time." *Id.*, 75.

[4] The First Circuit's statement in *Forest v. City of Pawtucket* regarding the nature of probable cause is typical:

> "[P]robable cause analysis requires inquiry into the facts and circumstances within the arresting officer's knowledge at the time of arrest to determine if a person of 'reasonable caution and prudence' would have believed that the defendant *committed a crime*."

377 F.3d 52, 56 (1st Cir. 2004) (emphasis added), quoting *Floyd v. Farrell*, 765 F.2d 1, 5 (1st Cir. 1985).

[5] See also Exhibit L (Lacey, 10-11; Exhibit J (Wright, 16-20); Exhibit M (Trombino, 8-11) Exhibit N (Turano, 63-64)

Lachapelle could not remember anyone ever being arrested for it in his nineteen years with the Department. *Id.*, 75-76.

Even more suprising was Corporal Lachapelle's testimony that one of the individual defendants, Officer Frank Brancato, agreed with him. Corporal Lachapelle, Brancato's shift supervisor, testified that Brancato acknowledged at the time of Mr. Mauti's arrest that the violation with which he was charged was not an "arrestable offense," i.e., it was not a crime:

> Q. What did you say to Officer Brancato about the charge?
>
> A. That it was the wrong charge. That normally in that situation, as far as myself and the officers I have seen, you just use the RITT summons. It is not an arrestable offense.
>
> Q. What was Officer Brancato's reaction?
>
> A. He agreed. He was a quiet guy.

Exhibit G (Lachapelle, 103-05). That admission by Brancato by itself bars summary judgment on the basis sought by the Defendants.

**The "Related Crimes" Doctrine Does Not Apply To This Case**

The related crimes or related offense doctrine "provides 'that even where there is no probable cause to arrest the plaintiff for the crime charged, proof of probable cause to arrest the plaintiff for a related offense is also a defense which may entitle the arresting officer to qualified immunity.'" 191 F.3d at 17, *quoting Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997). For several reasons, the related-offense doctrine does not support a defense of qualified immunity to the claims asserted in this case, much less justify summary judgment in Defendants' favor.

The inapplicability of the related-offense doctrine to the circumstances of this case is glaringly apparent for two obvious reasons. First, as its name suggests, application of the doctrine presupposes *two criminal offenses* (1) the crime upon which the arrest was made, for which probable cause was lacking, and (2) the "related" crime, for which probable cause did exist in the eyes of the hypothetical reasonable officer. *Sheehy*, 191 F.3d at 19. In this case the first crime is missing – the conduct for which the Plaintiff was arrested was not even a crime. All of the defendants have conceded this.[6] It would be a radical transmutation of the "related-crimes" defense (not to mention requiring a name change) to suggest that it could be used to justify an arrest that when made was based on non-criminal conduct.

Second, in relying on the related-crimes doctrine, the facts of this case require that the Defendants completely ignore the logic of the defense and the limits on its application. Both were described by the First Circuit's decision in *Sheehy*:

> First, the crime with which the arrestee is charged and the crime offered to the court as a justification for the arrest *must relate to the same conduct*. Second, as a corollary of this first requirement, the two crimes must share similar elements or be directed generally at prohibiting the same type of conduct. These requirements prevent the "ex post facto extrapolations of all crimes that might have been charged on a given set of facts at the moment of the arrest . . . ." The related crimes defense, thus understood, "allows the arresting officer to choose which crime she will charge without having to charge every single offense sustainable on the facts, and yet does not open the door to the *extrapolation of offenses in an effort to justify a sham arrest*." *Biddle v. Martin, 992 F.2d 673, 677 (7th Cir. 1993)* (internal quotation marks omitted).

*Sheehy*, 191 F.3d at 20 (citations omitted)(emphasis added).

[6] Although the Plaintiff obviously did not know it at the time, Defendant Brancato conceded this point at the time of the arrest, when he agreed with Corporal Lachapelle that a violation of RIGL 31-10-1 was not an arrestable offense. Exhibit G (Lachapelle, 103-05). Every other WPD officer who has been asked (all of whom were patrol supervisors) has agreed. See Plaintiff's Additional Undisputed Fact No.s 22, 23, and accompanying citations. What sparse data the defendants have produced in discovery to date confirms that every violation of § 31-10-1 in the last four years was handled through issuance of a Traffic Court citation, except for one – presumably Mr. Mauti's. Exhibit O.

There is another aspect of this case that makes application of the related-crime defense inapplicable. As noted by the Court of Appeals in *Sheehy*, the doctrine typically requires a comparison of “the crime cited by the officer at the time of the arrest [and] the crime cited a short time later at the police station.” In this case it is not only the temporal element – the passage of more than a year between the arrest and the first appearance of the “related” crime now offered to justify it – that should give the Court pause. In this case, not only was the now proffered “related” crime not mentioned by any witness and nowhere to be found in any document produced until more than eighteen months after the arrest, but when it finally came into view as the centerpiece of the summary judgment motion, it came in the form of a questionable entry on a fingerprint card that was required by both court order and statute to have been destroyed following dismissal of the state court prosecution. See Plaintiff’s Additional Undisputed Fact No. 38, and accompanying citations.

Despite their reliance on the doctrine, the Defendants make no real effort to apply it to the facts of this case. For example, they make no attempt to satisfy the requirement stated in *Sheehy* that “the crimes must share similar elements or be directed generally at prohibiting the same type of conduct.” 191 F.3d at 20. Ignoring for the moment the fact that section 31-10-1 is not a crime, it is clear that it would not satisfy this test for “relatedness” even if it were. The three grounds mentioned in the title of section 31-11-18 – denial, suspension, and revocation – each involve an underlying administrative or judicial determination that the person charged should not have a Rhode Island license – either an application was denied, or a license previously granted was suspended or revoked. An expired license puts a prospective defendant on notice in a different way –

the license includes the expiration date on its face. Similarly, someone who has never obtained a license at all would be hard-pressed to claim that they did not know they needed one.

Section 31-11-118 is obviously intended to keep bad (or potentially bad) or unqualified drivers off Rhode Island roads. It does so by identifying three categories of individuals whose unfitness to drive has been either administratively or judicially established – by the Department of Motor Vehicles denying their application for a license, or by a court suspending or revoking it, and another category of those who have let a license lapse or never obtained one, so that the state has no assurance that they still are or ever were qualified. Someone like Mr. Mauti, who had a valid license from another state, falls into none of those categories, and the attempt to jam the round peg into a square hole would, if successful, do serious damage to the Constitution's due process clause (which requires some kind of notice that conduct is criminal) and / or the Full Faith and Credit Clause (which requires Rhode Island honor Arizona's licensing laws, and *vice versa*).

Section 31-10-1 serves an obviously different and purely regulatory purpose, and certainly contains no element that requires a defendant have any reason to know that the conduct proscribed might be illegal. It reflects the state's interest in being the licensing authority for people that live in Rhode Island. There is no obviously apparent public safety purpose, an interpretation that is confirmed by the fact that the same day of his arrest Mr. Mauti obtained a permanent Rhode Island license simply by surrendering his valid Arizona license to the Rhode Island DMV.

When Mr. Mauti gave Matarese his Arizona driver's license, her initial reaction was to check whether he had previously had a Rhode Island license that had been suspended. She accordingly ran a computer check on his license, but it came back clean. Exhibit B (Affidavit of Lise Gescheidt, ¶ 4(c)). At that point, Plaintiff submits, there was no reasonable basis for concluding that there was probable cause to arrest Mr. Mauti for violating R.I.G.L. § 31-11-18. Nothing that any of the officers involved said that morning suggested that any of them, including Matarese, thought differently.

To the contrary, when Corporal Lachapelle told Captain Matarese that the charged violation of section 31-10-1 was not an arrestable offense, she made no mention of section 31-11-18 but went to the trouble of pulling the volume of the General Laws off the shelf during the discussion and pointing to section 31-10-1, continuing to insist that section 31-10-1 was an arrestable offense. Had Defendant Matarese indeed considered a different (and more serious) charge, one would reasonably expect her to have mentioned it to Lachapelle, especially if (as she now claims in ¶ 9 of her Affidavit) she charged Mr. Mauti with the less serious charge since "it would be easy for him to resolve, by simply getting a Rhode Island license." Matarese Affidavit, ¶ 9. According to Corporal Lachapelle's testimony, she said no such thing.

**The "Sham Arrest" Issue**

A number of undisputed facts support the inference that Matarese's stated reason for the stop were and are a fabrication, and that it was the kind of "sham arrest" that the Court of Appeals in *Sheehy* warned would *not* be protected by the "related crimes" defense. Mr. Mauti drew that inference at the time of his arrest, and it was confirmed

more than a year later by the testimony of several WPD patrol supervisors that they independently drew the exact same inference within hours of his arrest – concluding that Matarese had arrested Mr. Mauti "as a favor" to Hopkinton's police chief John Scuncio. See Plaintiff's Additional Undisputed Fact No. 39, and accompanying citations. The facts that led not just the Plaintiff, but also a number of the senior officers in the Department, to look past the stated reason for the stop and arrest of Mr. Mauti and suggest in its place what they considered a more likely reason demonstrate the existence of a factual issue regarding Matarese's version of events. The existence of that issue bars summary judgment.

There are additional facts that fit the conclusion reached by Mr. Mauti and the WPD patrol supervisors much better that the chance encounter version of the stop offered by the Defendants. It is undisputed, for example that on May 9, 2005, the day before the anonymous construction worker pointed at Mr. Mauti's car and then disappeared, someone at the Westerly Police Station used the secure computer terminals in the dispatch room to run two inquiries on Mr. Mauti through the NCIC/RILETS criminal information database. Someone in the Department wanted to know whatever they could learn about Mr. Mauti – which would include the status of his drivers license – a day in advance of his arrest.

Despite the fact that such misuse of the NCIC system is a federal felony, *e.g.*, 18 U.S.C. § 1030, Westerly's Police Department says that it still does not know who ran the May 9th NCIC/RILETS inquiry concerning Mr. Mauti. As the WPD officer responsible for state district court prosecutions, Matarese was trained to and did conduct such

inquiries as part of her routine. Exhibit I (Deposition of Donald Cornell, 63.)[7] and in the absence of any other explanation, it is a reasonable inference that she is the one who used the NCIC terminal on May 9th. Although ordered to produce the printout of that inquiry as part of the Court's October 16th Memorandum and Order, the defendants have failed to do so, producing only the printout for the inquiries on May 10th, the day of the arrest, and leaving this serious question still unanswered.

**The Judicial Estoppel Doctrine Should Bar The Defendants' Reliance on R.I.G.L. § 31-11-18 to Support The "Related Crimes" Defense**

Earlier in this case the Defendants objected to discovery regarding arrests or citations issued by members of the Department under any section of the Motor Vehicle Code over the last several years. They took the position that such information for every section of Title 31 other than section 31-10-1 was irrelevant. The Court accepted that position, and consequently upheld the objection in ruling on the Plaintiff's Motion to Compel last October.

"'As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.'" *Alternative System Concepts, Inc. v. Synopsis, Inc.*, 374 F.3d 23, 33 (2004), quoting *Intergen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003). Given that statement of the doctrine, it is difficult to imagine a more appropriate circumstance for application of the doctrine than the summary judgment motion before the Court. The Defendants were successful in their effort to convince the Court that the Plaintiff was not entitled to any information concerning citations or arrests by the WPD for violations of other sections of the Motor

---

[7] Matarese attended at least three seminars conducted by the FBI and Rhode Island State Police concerning the policies and procedures applicable to use of the NCIC/RILETS database. Exhibit K.

Vehicle Code, since such information was "immaterial" and the Requests "overbroad." than for violations of section 31-10-1. To a series of three requests seeking records of traffic citations (Request 16), custodial arrests for violation of any section of Title 31 (Request 17), and misdemeanor prosecutions for violation of any section of Title 31 (Request 18), the Defendants' Objection was the same: "Objection, overbroad, immaterial, and not calculated to lead to the discovery of admissible evidence, see *State v. Bjerke,* infra."[8] In their response to Plaintiff's Motion to Compel the defendants argued to the Court that the only records with even "theoretically" relevant "to the case" were those dealing with "the specific statutory offense charged against the plaintiff[,]" i.e., R.I.G.L. § 31-10-1:

> **REQUEST #16 - ANY TRAFFIC CITATIONS ISSUED BY MEMBERS OF THE DEPARTMENT WITHIN THE LAST 2 YEARS, INCLUDING THE SPECIFIC STATUTORY OFFENSE CHARGED**
>
> The defendant would be willing to withdraw its objection if the request was limited to the specific statutory offense charged against the plaintiff. Theoretically, such a limited request might have some relevancy to the case, but the request, as currently written, is clearly over broad and immaterial.

Defendants' Memorandum in Opposition to Plaintiff's Motion to Compel, at 8. They incorporated the same argument by reference for Requests 17 and 18. *Id.* The Court's Memorandum and Order accepted the Defendants' argument completely, and limited the discovery allowed accordingly:

> **Request Nos. 16-18.** GRANTED IN PART. DEFENDANTS SHALL RESPOND ONLY AS TO INCIDENTS INVOLVING CLAIMED VIOLATIONS OF R.I. GEN. LAWS § 31-10-1.

[8] A copy of the Plaintiff's Motion to Compel, which recites each request and the defendants' response, is attached as Exhibit U. Requests 16 through 18 are at page 15.

A complete copy of the Court's Memorandum and Order is attached as Exhibit __.

There is no question, given the above, that the two conditions for application of judicial estoppel identified by the Court of Appeals in *Advanced Systems* are satisfied in this case. First, the defendants' current reliance on the potential applicability of section 31-11-18 as a "related crime" that they argue supports the qualified immunity defense at the heart of their summary judgment motion is "directly inconsistent" with their earlier position that every section of Title 31 other than 31-10-1 is irrelevant to this case. The Defendants' summary judgment motion makes section 31-11-18 not simply relevant but *central* to their defense. Second, there is no question but that the Defendants "have succeeded in persuading a court to accept [their] prior position." *Advanced Systems, supra,* 374 F.3d, at 33. It is also clear that the claim poses the dangers against which judicial estoppel is meant to protect by "raising the specter of inconsistent determinations and endangering the integrity of the judicial process." *Id.*

**The Defendants Should Not Be Permitted to Rely on a Fingerprint Card That Was Was Required to Be Destroyed By Court Order and By Statute**

As part of their argument that the defendants are entitled to summary judgment based on the related offense doctrine, Defendant Matarese now claims that at the time of the arrest she considered charging Mr. Mauti with violating section 31-11-18 instead of 31-10-1. Given that none of the contemporaneous documents support her claim, she is left to rely only on a single reference to section 31-11-18 on the back of Mr. Mauti's fingerprint card. Matarese Affidavit, ¶ 9, and Exh. A thereto. For several reasons, their reliance on this document should be permitted.

Not the least of those reasons is that the Westerly Police Department's continued possession of this document violates the express terms of the Order entered by the state

district court at the time it dismissed the Town's criminal case against Mr. Mauti as well as a state statute requiring the same thing.[9]

The issue is not a novel one in this District, the rule having been established by the decision in *Coalition of Black Leadership v. Doorley*, 349 F. Supp. 127 (D.R.I. 1972) in circumstances closely similar to those in this case. Judge Pettine's decision suggested that the failure to produce the documents initially would justify their exclusion, but that offering documents that were required by law to have been destroyed was an additional and independent reason for excluding them. Id., at 130-31. The Court in Doorley disclaimed jurisdiction to itself order the destruction of the photographs, but noted that it did have jurisdiction "to rule on whether these photographs may be excluded as being illegally held evidence. Id., at 130. The Court reasoned that had the defendants complied with the statute, "there would be no photographs to introduce in Court. Thus the exclusion of photographs would give to the plaintiffs no greater remedy than that given them by the Rhode Island legislature and may be seen as simply a logical concomitant of the statutory remedy." *Id.*, at 130. "Were there no photographs there could be no question of their being put into evidence. The photographs will be excluded."

Matarese also gave testimony reflecting doubt on the authenticity of the fingerprint card offered as an exhibit. She testified that information concerning the arrest is put into the WPD computer system by the booking officer (in this case Officer Brancato), and that the information such as name, date of birth, and the *offense charged*,

[9] § 12-1-12. **Destruction or sealing of records of persons acquitted or otherwise exonerated**
(a) Any fingerprint, photograph, physical measurements, or other record of identification, heretofore or hereafter taken by or under the direction of the attorney general, the superintendent of state police, the member or members of the police department of any city or town or any other officer authorized by this chapter to take them, of a person under arrest, prior to the final conviction of the person for the offense then charged, shall be destroyed by all offices or departments having the custody or possession within sixty (60) days after there has been an acquittal, dismissal, no true bill, no information, or the person has been otherwise exonerated from the offense with which he or she is charged

is then automatically transferred to the various documents prepared as part of the booking process, including the fingerprint card. Exhibit E (Matarese Deposition, 146-48). The result, according to Matarese, is that any particular item of information concerning the arrest will be identical on each of the forms filled out as part of the process. Matarese's description of how the documents are filled out holds true for every item of information contained on the fingerprint card and the other documents filled out at the same time *except* the charge. The fingerprint card is the only document in the group that does not list 31-10-1 as the offense. Given Matarese's own testimony, and in the absence of any explanation to explain the discrepancy, her deposition testimony conflicts with her Affidavit and would raise a factual issue on this point even were the Court to consider it to be admissible evidence despite the decision in *Doorley*.

**Conclusion**

For the reasons set forth above, Plaintiff requests that the Court deny the Motion for Summary Judgment.

Charles Mauti
By his Attorneys,

/s/ John P. Gyorgy________________

John P. Gyorgy No. 3560
John R. Harrington No. 7173
Noel & Gyorgy LLP
50 South Main Street
Providence, Rhode Island 02903
(401) 272-7400
(401) 621-5688 (Fax)
JPGyorgy@LawNoel.com
JRHarrington@LawNoel.com

**Certification**

I hereby certify that on January 19, 2007, I sent a copy of the foregoing document to the following counsel of record by electronic noticing through the Court's ECF system:

Michael Collucci, Esq.
Olenn & Penza
530 Greenwich Avenue
Warwick RI 02886

/s/ John P. Gyorgy