# Exhibit A

United States District Court
District of Rhode Island

Charles Mauti,

v. CA No. 06-61T

Lauren Matarese, *et al.*

Affidavit of Charles Mauti In Support of
Objection to Defendants' Motion for Summary Judgment

Having been duly sworn, Charles Mauti states as follows:

1. I am the plaintiff in this case.

2. On May 10, 2005, at approximately 7:30 a.m. I was driving on Grove Avenue in the Town of Westerly, Rhode Island. Construction work was being performed at that location at the time.

3. I was driving a 1990 full-size Ford Bronco and was traveling along my regular route from my home in Westerly, Rhode Island, to my office in the Hopkinton Town Hall, where I was employed as Hopkinton's Building and Zoning Official.

4. Because of the construction project along the side of Route 3 (Grove Avenue), traffic was moving at the posted reduced speed limit. As usual at that time on a weekday morning, the traffic on this stretch of Grove Avenue was steady, and there were several cars both ahead of and behind me.

5. As I was passing through the construction zone, I noticed a black car on the opposite side of Grove Avenue. Immediately after I went past the black car, it turned around and pulled directly behind my car.

6. I then saw flashing lights behind its grille and recognized it as an unmarked police car. I immediately pulled my car out of traffic and over to the side of the road.

7. Captain Matarese got out of the unmarked car and approached the driver side window of my car. I asked why I was being stopped and Captain Matarese said it was because a construction worker had pointed at my car. She said nothing further in response to my question, except that when she looked again the construction worker was not there. She said nothing further regarding the construction worker.

8. Captain Matarese then asked me for my driver's license, vehicle registration, and proof of insurance.

9. I handed Captain Matarese all three documents, including what I thought was the registration certificate for the Bronco I was driving. The registration was contained in a packet on my windshield visor which also contained the registration certificate for a boat trailer we used the Bronco to tow. The Bronco and trailer registrations were folded together and clipped with a paper clip.

10. At the time I was arrested, I had (and gave to Captain Matarese) a valid and unexpired drivers license from the state of Arizona, where I had lived until I moved to Rhode Island.

11. I have never had any driver's license issued by Rhode island or Arizona suspended or revoked, nor has either state ever refused my application for a driver's license.

12. Officer Brancato pulled up behind Matarese's car immediately after I gave my drivers license, proof of insurance, and vehicle registration to Captain Matarese, and prior to her walking back to her car with the documents I had given her.

13. Captain Matarese returned to my car and informed me that it was a violation of Rhode Island law not to have a Rhode Island driver's license if you have lived in the state for more than thirty days.

14. Captain Matarese then told me to get out of my car, which I did. She then led me to the back of her car.

15. Captain Matarese left me in the custody of Officer Brancato, who told me to empty my pockets, which I did. Officer Brancato then took possession of my wallet, cell phone, and other items, including the two registration certificates for the Bronco and the trailer that Captain Matarese had given back to me.

16. It was at this point that I asked Officer Brancato if I was being arrested, and he said I was. Captain Matarese never told me that I was being arrested.

17. He placed me in the back of his marked police car and drove me to the Westerly police station.

18. Neither Matarese nor Brancato ever presented me with a warrant for my arrest.

19. My conduct at the time of my arrest did not pose any danger to myself or others, and posed no threat to any property.

20. At the Westerly police station, I was finger-printed by Captain Matarese, and photographed by Officer Brancato. The booking process I went through at the Westerly police station lasted approximately one hour.

21. Before I left the station I was given the ticket that is attached to this Affidavit as Exhibit 1, and a Summons requiring me to appear in Fourth Division District Court on May 20, 2005. The Summons listed the "CRIME" as "No License." A copy of the Summons is attached as Exhibit 2.

22. Captain Matarese said nothing to me indicating that I was under arrest for, or that she was considering charging me with violating R.I.G.L. 31-11-18.

23. Neither Captain Matarese nor Officer Brancato ever told me that my Arizona driver's license was not valid in Rhode Island.

24. Captain Matarese and Officer Brancato did not issue me a citation for driving an unregistered vehicle or failing to have the Bronco's registration, nor did they tow my vehicle from the scene.

25. When the booking process was complete, Captain Matarese then drove me to the Department of Motor Vehicles office in Westerly, where I applied for a Rhode Island driver's license. Because I had an unexpired Arizona license which I turned in to the DMV, I was given a permanent Rhode Island license that day without being required to take a road test or written exam. The plastic laminated card was not available the same day the license was issued, but was mailed to me later. In the meantime, the DMV gave me a "temporary receipt" as evidence that I had been issued a Rhode Island driver's license. A copy of that receipt is attached as Exhibit 3.

26. On May 20, 2005 the Town of Westerly filed a one count Criminal Complaint against me in the Fourth Division of the Rhode Island District Court charging me with a misdemeanor, but listing the statutory violation as section 31-10-1. A copy of that Complaint is attached as Exhibit 3.

Charles Marti

**Notary Certificate**

Subscribed and sworn before me this 19th day of January, 2007.

Notary Public Kendra A. Nicastro
My commission expires:

# Exhibit 1 to Exhibit A

CR 393 AR

10766

05 504 000531
SUMMONS NO.

* 0 5 5 0 4 0 0 0 5 3 1 *

RITT-05, REV. 7/04

THE UNDERSIGNED OFFICER STATES THAT:

| ON MONTH | DAY | YEAR | AT (TIME) | | IN (TOWN) |
|---|---|---|---|---|---|
| 05 | 11 | 05 | 7 25 | A.M. | WESTERLY |
| | | | | P.M. | ROAD Grove AV |

| DRIVERS LICENSE NO. | CDL ☐ | ARMED FORCES ☐ | STATE |
|---|---|---|---|
| 057361730 | | | RI |

| MOTORIST'S FIRST NAME | MID INI | DATE OF BIRTH MONTH DAY YEAR | JUV |
|---|---|---|---|
| CHARLES | M | 05 31 46 | ☐ |

| LAST NAME | SEX |
|---|---|
| MAWTI | M ☑ F ☐ |

MAILING ADDRESS AS LISTED AT REGISTRY OF MOTOR VEHICLES — MOTORIST'S INITIALS

33 ELM ST

| CITY | STATE | ZIP CODE |
|---|---|---|
| WESTERLY | RI | 02891 |

DID UNLAWFULLY (CAUSE TO BE) OPERATE(D) A MOTOR VEHICLE

| VEHICLE REG. NO. | STATE | CDL VEHICLE | PLATE TYPE |
|---|---|---|---|
| P. 712 | RI | ☐ YES ☐ NO | PASS ☑ SUB ☐ COMM ☐ OTHER |

| SERIAL NUMBER/VIN | VEHICLE MAKE | YEAR |
|---|---|---|
| 1FMEU15H3LLB95698 | FORD | 90 |

| OWNED BY (LAST) | (FIRST) | (IN.) | TYPE | COLOR |
|---|---|---|---|---|
| PEZZULLO | PATRICIA | A | Ford | Blu |

| ADDRESS (NO.) | (STREET) | (CITY) | (STATE) | (ZIP) |
|---|---|---|---|---|
| | SAME | | | |

| ROAD COND. | TRAFFIC | VISIBILITY | ZONED SPEED | ACTUAL SPEED | LASER ☐ CLOCKED ☐ RADAR ☐ | ACCIDENT ☐ HAZ. MAT. ☐ |
|---|---|---|---|---|---|---|
| D | L | C | 25 | | | |

| VIOLATION CODE | CDL | VIOLATION(S) | STATUTE | FINE |
|---|---|---|---|---|
| 029 | | 1 No License (RI) | 31-10-1 | # |
| | | 2. | | |
| | | 3. | | |

☐ You may pay the total amount due by mail and not appear in court subject to the conditions on the back of this summons.
☐ You may not pay by mail and MUST appear in court.
☐ Persons under 18 years of age may not pay by mail and MUST appear at RITT with a parent or guardian.

TOTAL AMOUNT DUE $ Hearing

| COURT LOCATION: (401) 222-8000 | Your court date is: | Time: |
|---|---|---|
| ☐ Rhode Island Traffic Tribunal, Oliver Steadman Government Center, Tower Hill Road, Wakefield, RI 02879 | | 8:30 a.m. |
| District Court (401) 782-4131 ☑ Fourth Division District Court, McGrath Judicial Complex, 4800 Tower Hill Road, Wakefield, RI 02879 | 5 20 05 | 9:00 a.m. |
| Municipal Court (401) 596-7374 ☐ 45 Broad Street, Westerly, RI 02891-1890 | | 10:00 a.m. |

I certify that a copy of this complaint and summons was served on the person named above as required by law.

| OFFICER SIGNATURE | DEPT. NO. | OFFICER ID NO. |
|---|---|---|
| [signature] | 504 | 102 |

By signing below I acknowledge that I have received and read this summons and that the information I have provided is true. I understand that if I am required to appear in court on the date and time given, my failure to do so will be admission of the violation(s) above and penalties will be imposed as provided by law.

| MOTORIST'S SIGNATURE | DATE | OFFICER'S INITIALS |
|---|---|---|
| X | | |

DEPARTMENT COPY

# Exhibit 2 to Exhibit A

STATE OF
RHODE ISLAND
AND
PROVIDENCE
PLANTATIONS

**DISTRICT COURT SUMMONS**

S-139C(8-74)

| COMPLAINT NO. | | 4th DIVISION OF THE DISTRICT COURT |
|---|---|---|
| STATE EX REL. | CITY/TOWN: Westerly | VS DEFENDANT: Charles Mauti |

YOU ARE HEREBY SUMMONED TO APPEAR BEFORE A JUDGE OF THE DISTRICT COURT FOR THIS DIVISION ON THE DATE AND AT THE TIME AND PLACE SHOWN BELOW TO ANSWER A COMPLAINT CHARGING YOU WITH THE CRIME DESCRIBED HEREIN.

CRIME
No License

STATUTE(S) VIOLATED
31-10-2

THE TIME, DATE AND PLACE OF HEARING

| TIME | DATE | LOCATION |
|---|---|---|
| 9:00 AM M | 5-20-05 | 4800 Tower Hill Road, South Kingston, RI |

**IF YOU FAIL TO APPEAR AND ANSWER, A WARRANT WILL BE ISSUED FOR YOUR ARREST.**

| DATE | JUDGE, JUSTICE OF THE PEACE |
|---|---|
| | x |
| DATE: May 10, 2005 | POLICE OFFICER (MISDEMEANOR) |

**WILLFUL FAILURE TO APPEAR IN ANSWER TO THIS SUMMONS MAY BE PUNISHED BY A FINE OF NOT OVER FIFTY DOLLARS (50.00) OR IMPRISONMENT FOR NOT OVER FIFTEEN (15) DAYS.**

# Exhibit 3 to Exhibit A

# Rhode Island And Providence Plantations

# TEMPORARY RECEIPT **DL**



DRIVER LICENSE # 2550509 CLASS:10 RESTR:A ENDORS:
DATE OF BIRTH: 05-31-1946
EXPIRATION DATE: 05-31-2007
TRANSACTION DATE: 05-10-2005

CHARLES M MAUTI
33 ELM ST
WESTERLY, RI 02891



RHODE ISLAND
DIVISION OF
MOTOR VEHICLES
ADMINISTRATOR

**Class:** 10 - Operator License

**Endorsements:** None

**Restrictions:** A - Glasses

**This document expires 60 days from the Transaction Date printed above.**

**You should receive your card in the mail within 30 days.**

♥ = Organ Donor

# STATE OF RHODE ISLAND DISTRICT COURT CRIMINAL COMPLAINT

DISTRICT COURT NO. 2005-001882 | COURT DIVISION: FOURTH | POLICE NO. 504

STATE EX REL | VS. DEFENDANT (NAME AND ALIAS): CHARLES M. MAUTI

DEFENDANT ADDRESS AND PHONE: 33 Elm Street, Westerly, RI 02891 (STREET / CITY / STATE / PHONE)

| DEF. D.O.B. | DEF. BCI NO. | DEF. SOC. SEC. NO. | DEF. M.V. LIC. NO. |
|---|---|---|---|
| 5-31-46 | @1015765 | 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 | |

OFFENSE DATE: 5-10-05 ☐ DIVERS DATE | OFFICER/COMPLAINANT: Capt. L. Matarese

POLICE DEPT./COMPLAINANT ADDRESS: Westerly Police Department

05-504-000531

| DETERMINE ATTY DATE | PRE TRIAL DATE 5/27/05 |
|---|---|
| PRE-ARRAIGN CONF DATE | TRIAL DATE 6/7/05 |
| SUPERIOR CT ARRAIGN DATE | MISC DATE/BAIL HRG/CONTROL |

TO ANY JUDGE OR JUSTICE OF THE PEACE: ON BEHALF OF THE STATE I SWEAR THAT THE ABOVE DEFENDANT DID COMMIT THE FOLLOWING OFFENSES:

OFFICER/COMPLAINANT X Capt [signature] | DATE 5.20.05 | SWORN TO BEFORE JUDGE/JUSTICE OF THE PEACE X [signature] | DATE 5/20/05

## INITIAL APPEARANCE

APPEARANCE DATE | BAIL FOR ALL COUNTS $ | ARRAIGNMENT DATE | JUSTICE OF THE PEACE

## ARRAIGNMENT

ARRAIGNMENT DATE 5/20/05 | ADVISED OF RIGHTS ☒ YES ☐ NO | JURY TRIAL WAIVED ☒ YES ☐ NO | PLEA COUNT 1 NG | PLEA COUNT 2 | PLEA COUNT 3

BAIL FOR ALL COUNTS $ 1000 PR | ATTORNEY NAME | ☐ PRIVATE ☐ COURT APPT. ☐ P.D. | JUDGE/JUSTICE OF THE PEACE X [signature]

**COUNT 1** STATUTE(S) VIOLATED 31-10-1 | ☐ FELONY ☒ MISDEMEANOR ☐ VIOLATION ☐ ORDINANCE

DRIVING WITHOUT A LICENSE

"Did operate a motor vehicle on a highway within this State, to wit High Street, so-called, in the Town of Westerly, at a time when he did not have a valid RI license to operate a motor vehicle, in violation of RIGL 31-10-1 as amended."

DISPOSITION: ☐ DISMISSAL ☐ GUILTY PLEA ☐ NOLO PLEA ☐ GUILTY FINDING ☐ NOT GUILTY FINDING ☐ CASE FILED 1 YEAR ☐ INFO/TRUE BILL ☐ NO INFO/NO TRUE BILL ☐ OTHER ____ | SENTENCE IMPOSED

PROCEEDING: ☐ ARRAIGN ☐ PRE TRIAL ☐ TRIAL ☐ OTHER | APPEAL TAKEN ☐ | JUDGE X | DATE

**COUNT 2** STATUTE(S) VIOLATED | ☐ FELONY ☐ MISDEMEANOR ☐ VIOLATION ☐ ORDINANCE

DISPOSITION: ☐ DISMISSAL ☐ GUILTY PLEA ☐ NOLO PLEA ☐ GUILTY FINDING ☐ NOT GUILTY FINDING ☐ CASE FILED 1 YEAR ☐ INFO/TRUE BILL ☐ NO INFO/NO TRUE BILL ☐ OTHER ____ | SENTENCE IMPOSED

DISCOVERY

PROCEEDING: ☐ ARRAIGN ☐ PRE TRIAL ☐ TRIAL ☐ OTHER | APPEAL TAKEN ☐ | JUDGE X | DATE

**COUNT 3** STATUTE(S) VIOLATED | ☐ FELONY ☐ MISDEMEANOR ☐ VIOLATION ☐ ORDINANCE

DISPOSITION: ☐ DISMISSAL ☐ GUILTY PLEA ☐ NOLO PLEA ☐ GUILTY FINDING ☐ NOT GUILTY FINDING ☐ CASE FILED 1 YEAR ☐ INFO/TRUE BILL ☐ NO INFO/NO TRUE BILL ☐ OTHER ____ | SENTENCE IMPOSED

PROCEEDING: ☐ ARRAIGN ☐ PRE TRIAL ☐ TRIAL ☐ OTHER | APPEAL TAKEN ☐ | JUDGE X | DATE

VICTIM(S) NOTIFIED ☐ ARRAIGNMENT ☐ PRE TRIAL ☐ TRIAL | VICTIM(S) APPEARED ☐ ARRAIGNMENT ☐ PRE TRIAL ☐ TRIAL | CASE TYPE ☐ DOMESTIC VIOLENCE | IMMEDIATE APPEAL TAKEN DATE JUDGE X | ADDITIONAL COUNTS ATTACHED

PROSECUTION COPY

# **Exhibit B**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CHARLES MAUTI,

v. CA NO. 06-61T

LAUREN MATARESE, ET AL.

AFFIDAVIT OF LISE GESCHEIDT

I, Lise Gescheidt, having been duly sworn, make the following statement:

1. I am an attorney licensed to practice in the State of Rhode Island and am admitted to practice before this Court. I have personal knowledge of the matters set forth in this Affidavit and would be competent to testify thereto if called upon to do so.

2. In May of 2005 I represented Charles Mauti in the case brought against him by the Town of Westerly in the Fourth Division of Rhode Island District Court charging him with a violation of R.I.G.L. § 31-10-1.

3. At Mr. Mauti's arraignment on May 20, 2005, I spoke with Captain Lauren Matarese before court about the circumstances of Mr. Mauti's arrest. Captain Matarese was the arresting officer and also the prosecuting officer for Westerly's cases in state district court.

4. During that conversation, Captain Matarese described to me the circumstances of her stopping Mr. Mauti's car as follows:

   a. As she was driving through a construction area, a construction worker pointed to Mr. Mauti's car. She did not recognize Mr. Mauti or his car, and did not observe any traffic or motor vehicle violations in her presence.

   b. She did not have any conversation with the construction worker before stopping Mr. Mauti's car, and she did not know why he pointed at it.

c. When Mr. Mauti gave her an Arizona driver's license, she recognized his name and knew he was a Rhode Island resident because of a previous dispute he had with the Town. She thought his Rhode Island license might have been suspended, but when she ran a check on his license it came back clean.

5. Captain Matarese never made any further statement to me or provided any additional information that differed from, contradicted, added to, or elaborated upon what she said to me on May 20th regarding the construction worker who she said pointed at Mr. Mauti's car.

6. The Town's prosecution of Mr. Mauti was dismissed on May 27, 2005, at the conclusion of a hearing before Judge Erickson. The Court at that time also entered an Order, a copy of which is attached as Exhibit A to this Affidavit, which required among other things that the Town "destroy any fingerprints, photographs, physical measurements or other records of arrest and identification" of Mr. Mauti made in connection with his arrest on May 10, 2005. Captain Matarese was in Court when this Order was entered, and I handed her a signed copy of the Order before we left.

7. I sent another copy of the Order, with a cover letter, to the Westerly Police Department on May 31, 2005. A copy of my letter is attached as Exhibit B to this Affidavit.

Lise Gescheidt

**Notary Certificate**

Subscribed and sworn to in Providence, Rhode Island, this 17th day of January, 2007.

Notary Public
Commission Expires: 2/18/09

# **Exhibit A to Exhibit B**

STATE OF RHODE ISLAND
WASHINGTON, SC

FOURTH DIVISION
DISTRICT COURT

TOWN OF WESTERLY

VS

CHARLES M. MAUTI

ORDER

This matter came to be heard on this ______ day of ________________, 2005 before the Honorable Stephen Erickson, Associate Justice of the District Court, and after hearing thereon, it is hereby;

ORDERED, ADJUDGED AND DECREED

1. That Charles M. Mauti (dob 5-31-46) is entitled to the sealing of Court records in this case;

2. That said records shall be sealed;

3. That, within forty-five days, the Office of the Attorney General, the Westerly Police, the Rhode Island State Police, and the State Bureau of Criminal Identification shall destroy any fingerprints, photographs, physical measurements or other records of arrest and identification of said Charles Mauti taken in connection with the above-entitled complaint regarding his custodial arrest on or about May 10, 2005 for [redacted] violation of GL 31-10-1. and further that the Westerly Police Department and BCI advise the FBI of this Order and request the FBI to destroy and expunge all records of defendant's arrest and prosecution in connection with this offense.

By Order: Rose Mary T. Cantley
CLERK

ENTER: ______________________
The Honorable Stephen Erickson
Associate Judge of the District Court
5/27/05

A True Copy
Attest:
Clerk/Deputy Clerk

# Exhibit B to Exhibit B

MACFADYEN, GESCHEIDT & O'BRIEN
ATTORNEYS AT LAW

THE OWEN BUILDING
101 DYER STREET • PROVIDENCE, RI 02903

TELEPHONE
401-751-5090

FACSIMILE
401-751-5096

JOHN A. MACFADYEN
LISE J. GESCHEIDT
C. LEONARD O'BRIEN

OF COUNSEL
B. JEAN ROSIELLO
TAMARA A. BARNEY

May 31, 2005

Office of the Attorney General
150 South Main Street
Providence, RI 02903

BCI
150 South Main Street
Providence, RI 02903

Westerly Police Department
Union Street
Westerly, RI 02891

Rhode Island State Police
311 Danielson Pike
North Scituate, RI 02857

RE: Westerly Police Department vs. Charles M. Mauti
Fourth Division #41-2005-001882

Dear Sirs:

Enclosed please find an Order Sealing all records of my client's arrest and prosecution in connection with his arrest in Westerly for driving in violation of the requirements of G.L. 31-10-1, and ordering the destruction of all records of identification taken in connection with this arrest.

I would appreciate you advising me when your department has complied with this Order. Thank you for your cooperation. Best wishes.

Sincerely,

Lise J. Gescheidt

Cc: Charles M. Mauti

# Exhibit C

Westerly Police Department
Arrest Report

Arrest #: 05-393-AR
Call #: 05-10766

Date/Time Reported: 05/10/2005 @ 0730
Arrest Date/Time: 05/10/2005 @ 0744
Booking Date/Time: 05/10/2005 @ 0744

Court: 4TH DISTRICT COURT
Court Date: 05/20/2005 @ 0900
Reporting Officer: Captain Lauren Matarese
Assisting Officer: Patrol Frank Brancato
Booking Officer: Patrol Frank Brancato

| # | DEFENDANT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | MAUTI, CHARLES<br>33 ELM ST<br>WESTERLY RI 02891 | M | W | 58 | NOT AVAIL | 501-348-9882 |

HEIGHT: 511 WEIGHT: 180
BODY: NOT AVAIL.
DOB: 05/31/1946
LICENSE NUMBER: NOT AVAIL.

HAIR: BROWN EYES: BROWN
COMPLEXION: NOT AVAIL.
PLACE OF BIRTH: NY
ETHNICITY: NOT HISPANIC

[APPEARANCE]

GLASSES WORN: YES

SCARS: SC BACK(6 INCH)

| ALIAS LAST NAME | FIRST NAME | MIDDLE NAME | SSN | DOB |
|---|---|---|---|---|
| MAUTI | CHARLES | | NOT AVAIL | 05/31/1946 |

[FAMILY/EMPLOYMENT INFORMATION]

MARITAL STATUS: MARRIED
SPOUSE'S NAME: PEZZULLO, PATRICIA
FATHER'S NAME: DECEASED, DECEASED

EMPLOYER/SCHOOL: TOWN OF HOPKINTON
395 WOODVILLE RD
HOPKINTON RI

OCCUPATION: BUILDING OFFIC

[RIGHTS/BOOKING CHECKS]

PHONE USED: N
ARRESTEE SECURED: N

PHONED DATE/TIME: 05/10/2005 & 0745

FINGERPRINTED: Y
PHOTOGRAPHED: Y
SUICIDE CHECK: Not Performed
PERSONS: State&Federal
NCIC VEHICLE CHECK: Not Performed
INJURY OR ILLNESS: N

DISCOVERY

Arrest Report

Arrest #: 05-393-AR
Call #: 05-10766

| # | OFFENSE (S) | A/C | STATE LAW | |
|---|---|---|---|---|
| | LOCATION TYPE: Highway/Road/Alley/Street Zone: North Side<br>1 NARRAGANSETT AVE @ 113 HIGH ST<br>WESTERLY RI 02891 | | | |
| 1 | LICENSE VIOLATIONS - GENERAL<br>OCCURRED: 05/10/2005 0730 | C | 31-10 | 1/4 |

DISCOVERY

NARRATIVE FOR CAPTAIN LAUREN MATARESE

Ref: 05-393-AR

While returning from the gas pump, I was traveling on Grove Ave in the construction zone, when a worker motioned about a vehicle that had just passed him. I turned around and stopped RI Reg. P-712 on High Street. The operator was identified as Mr. Mauti and he presented an Arizona's drivers license. He stated he had been residing in the area for several years and had the RI application at home, but never completed it. He then stated that he was considering returning to Arizona.

He was advised that under the statute 31-10-1 he must obtain a RI license within 30 days of establishing residency. I have personal knowledge that Mr. Mauti has in fact been a local resident for several years. Mr. Mauti was charged with No RI License and released with a court date of 5-20-05. With his permission, his vehicle was removed to the Sorensen and McCuin parking lot so it would not be towed.

Capt L. Matarese #2

DISCOVERY

# Exhibit D

**Checks from WEST01/RI0050401 0700 0900 hours May 10, 2005**

-----------------------------------------------

DQ.RI0050401.RI,CT.TXT
NAM/MAUTI,CHARLES.DOB/19460531.SEX/M
MRI 807571 IN: WEST01 5 AT 10MAY2005 07:27:54 OUT: SPBG00 20 AT 13APR2006 15:17:19
RETRIEVAL: ORIGINALLY INPUT - WEST01 5 AT 10MAY2005 07:27:54.

-----------------------------------------------

DQ.RI0050401.RI,CT,AZ.TXT
NAM/MAUTI,CHARLES.DOB/19460531.SEX/M
MRI 807669 IN: WEST01 6 AT 10MAY2005 07:28:38 OUT: SPBG00 21 AT 13APR2006 15:17:19
RETRIEVAL: ORIGINALLY INPUT - WEST01 6 AT 10MAY2005 07:28:38.

-----------------------------------------------

IQ.RI0050401.RI,CT.TXTPUR/C.ATN/CPL
LACHAPELLE.NAM/MAUTI,CHARLES.DOB/19460531.SEX/M.RAC/U
MRI 807922 IN: WEST01 7 AT 10MAY2005 07:32:40 OUT: SPBG00 22 AT 13APR2006 15:17:19
RETRIEVAL: ORIGINALLY INPUT - WEST01 7 AT 10MAY2005 07:32:40.

-----------------------------------------------

RQ.RI0050401.RI.TXTLIC/P712.LIY/2005.LIT/PC
MRI 808706 IN: WEST01 8 AT 10MAY2005 07:44:52 OUT: SPBG00 23 AT 13APR2006 15:17:19
RETRIEVAL: ORIGINALLY INPUT - WEST01 8 AT 10MAY2005 07:44:52.

-----------------------------------------------

**Checks from WEST00/RI0050400 1300 1400 hours May 9, 2005**

-----------------------------------------------

RQ.RI0050400.RI.TXTLIC/106506.LIY/2005.LIT/CO
MRI 716918 IN: WEST00 36 AT 09MAY2005 13:33:54 OUT: SPBG00 24 AT 13APR2006 15:24:30
RETRIEVAL: ORIGINALLY INPUT - WEST00 36 AT 09MAY2005 13:33:54.

-----------------------------------------------

DQ.RI0050400.RI.TXT
NAM/MAUTI,CHARLES.DOB/19460531.SEX/M
MRI 716970 IN: WEST00 37 AT 09MAY2005 13:35:00 OUT: SPBG00 25 AT 13APR2006 15:24:31
RETRIEVAL: ORIGINALLY INPUT - WEST00 37 AT 09MAY2005 13:35:00.

-----------------------------------------------

**Checks sent to NLETS (Out of State) May 31, 2005**

-----------------------------------------------

DQ.RI0050401.RI,CT.*0493807571.
NAM/MAUTI,CHARLES.DOB/19460531.SEX/M

MRI 807571 IN: WEST01 5 AT 10MAY2005 07:27:54 OUT: SPBG00 26 AT 13APR2006 15:37:43
RETRIEVAL: ORIGINALLY OUTPUT - NLET 1176 AT 10MAY2005 07:27:54.

---

DQ.RI0050401.RI,CT,AZ.*0493807669.
NAM/MAUTI,CHARLES.DOB/19460531.SEX/M
MRI 807669 IN: WEST01 6 AT 10MAY2005 07:28:38 OUT: SPBG00 27 AT 13APR2006 15:37:43
RETRIEVAL: ORIGINALLY OUTPUT - NLET 1182 AT 10MAY2005 07:28:39.

---

IQ.RI0050401.RI,CT.*0493807922.
PUR/C.ATN/CPL LACHAPELLE.NAM/MAUTI,CHARLES.DOB/19460531.SEX/M.RAC/U
MRI 807922 IN: WEST01 7 AT 10MAY2005 07:32:40 OUT: SPBG00 28 AT 13APR2006 15:37:43
RETRIEVAL: ORIGINALLY OUTPUT - NLET 1202 AT 10MAY2005 07:32:40.

# Exhibit E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLES MAUTI :
:
VS. : C.A. NO.: 06-61T
:
LAUREN MATARESE, ET AL. :

DEPOSITION OF LAUREN MATARESE, a Defendant in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Noel & Gyorgy, 50 South Main Street, Providence, RI, on January 11, 2007 at 10:00 A.M.

PRESENT:
FOR THE PLAINTIFF............ NOEL & GYORGY, LLP
BY: JOHN P. GYORGY, ESQUIRE

FOR THE DEFENDANT............ OLENN & PENZA, LLP
BY: MICHAEL COLUCCI, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920

INDEX


| WITNESS | PAGE |
|---|---|
| LAUREN MATARESE | |
| EXAMINATION BY MR. GYORGY................ | 3 |


EXHIBITS


| NO. | DESCRIPTION (PLAINTIFF'S) | PAGE |
|---|---|---|
| 1. | SCHEDULE........................... | 79 |
| 2. | AFFIDAVIT.......................... | 93 |
| 3. | PHOTO AND FINGERPRINTS............. | 93 |
| 4. | TICKET CITATION.................... | 93 |
| 5. | TEMPORARY RECEIPT.................. | 93 |
| 6. | REGISTRATION....................... | 93 |
| 7. | MAP................................ | 93 |
| 8. | MAP................................ | 94 |
| 9. | ARREST REPORT...................... | 120 |
| 10. | OFFENSE LISTING.................... | 120 |
| 11. | LETTER............................. | 120 |
| 12. | RI GEN LAW 31-11-18................ | 128 |
| 13. | ORDER.............................. | 149 |
| 14. | SUMMONS............................ | 159 |
| 15. | COMPLAINT.......................... | 159 |




cd514fb9-8d0b-410a-891e-1db1b8c39b0f

A. In-service training.
Q. Such as what?
A. There are different periods of time where an officer is dedicated to teaching a block of training. That officer will teach that block.
Q. That officer is not necessarily the training officer?
A. That's correct.
Q. Have you taught designated training blocks yourself?
A. Yes.
Q. Within the past, say, three years, have you done it since you became Captain?
A. Yes.
Q. Can you tell me when and tell me what substantive areas you taught?
A. Either September or October of 2006, it could have been November, I taught report writing.
Q. Do you still have your notes from Mr. Shipley's class?
A. No.
Q. He would be disappointed. What did that class consist of?

A. What is necessary to properly prepare a police report.

Q. What materials did you use for the class?

A. My own experience and some police manuals that were in the station.

Q. How did you conduct the class; did you buy sandwiches for everybody and say, come in on Saturday? What was the setting?

A. We have a training room, also the roll call room. It was a powerpoint presentation. It was very informal. The training officer set up the hours and the times and officers attended.

Q. As they could, did you conduct multiple sessions so everybody could get to it?

A. Yes.

Q. Rule Number 2 of the deposition, if I pause during a question, wait until I am done because she cannot write down what both of us say at the same time. I will try not to interrupt you, and if you could try to wait for me because it is a little unnatural because in a conversation, at least north of the Mason-Dixon Line, people interrupt each other all of the time.

A. Okay.
Q. This was fairly recent, September of last year?
A. Yes.
Q. Did the Chief ask you to conduct that training?
A. No.
Q. Why did you conduct it at the time you conducted it?
A. The training officer asked me to.
Q. Lieutenant Wright?
A. No, Turano.
Q. Lieutenant Wright, what is Lieutenant Wright's title, do you know?
A. No.
Q. They mean that much?
A. No, they are important.
Q. Lieutenant Turano asked you to conduct the training session on report writing?
A. Yes.
Q. Did he tell you why he wanted that done?
A. As part of our in-service training.
Q. Was it just that it was time to put that on again?
A. I don't know why he selected that

topic.
Q. You said that you used a powerpoint presentation?
A. Yes.
Q. Was that something prepared by you or someone else at the department?
A. Yes. It was prepared.
Q. Who prepared that?
A. I did.
Q. What did the powerpoint presentation consist of?
A. Slides.
Q. Were they written slides, were they graphics, were they copies of documents that were example; what did you use in the powerpoint presentation, bulleted points about what is important?
A. Bulleted points.
Q. How much of that do you remember in terms of what you tried to stress in the material that you prepared and presented?
A. A fair amount.
Q. Can you give us a five-minute synopsis of how to write a report?
A. The presentation was to be very

specific, depending on what you were investigating, detail-oriented. For example, a narcotics investigation would be more detailed-oriented than a minor infraction, like a speeding ticket. Spelling, grammar, update information. Get everybody's information.
Q. When you say, get everybody's information, you are talking about for any given event, if there are five people with firsthand knowledge of it, get everybody's information, not necessarily to include it, but to make sure there is nothing contradictory?
A. Anything that had to do substantively with the case.
Q. Can you explain that a little bit?
A. If you have ten people but not everybody witnessed it, give me the people that witnessed it.
Q. That sounds like focusing, rather than including too many, include what matters, is that one of the bulleted subpoints?
A. Not really.
Q. I am not sure I understand that part of it.

I can understand the detail-oriented include everything pertinent to the matter that is being investigated, get everybody's information?
A. The correct information. Some of our officers do not update the information regarding telephone numbers and addresses and that is important. That is what I mean by that.
Q. When you say update information, are you talking about contact information?
A. If you were to file a complaint today and listed 50 South Main Street as your address and you filed a complaint tomorrow, I would assume 50 South Main is still your address, but I ask the officers to confirm that because oftentimes that is not the case. If I have to contact that person or subpoena them, I would like to know where they are.
Q. As the court officer, you understand how important it is not to have to go looking for somebody at the last minute?
A. Yes.
Q. And you can stress that appropriately to

report writing was done in connection with promotional exams that were coming up?
A. No.
Q. Did you refer to the promotional exams with respect to the study books?
A. They were available because there had been a promotional exam. They were still in the station and I thumbed through the indexes to jog something in my memory.
Q. How often are promotional exams given?
A. Every two years.
Q. Before they are given, are the materials you are talking about materials that come into the station before promotional exams and tend to disappear after the promotional exams?
A. Yes.
Q. Where do they come from?
A. You have to ask the Chief that. I don't know.
Q. Is it an outside agency or another jurisdiction, or does it depend?
A. It depends, but there is a list of suggested reading material to prepare for whatever promotional exam you are preparing

A. Yes.
Q. Sometime during the fall of last year?
A. Yes. I know breathalyzer recertification I was there.
Q. Was that also this past fall?
A. I think so.
Q. Along with the one you did, you attended two others?
A. At least two others.
Q. One was breathalyzer and one was defensive driving?
A. Yes.
Q. Can you think of any others in the course of the past year you attended?
A. I know there is another one, but I can't recall what it was. I remember being present because I remember being there.
Q. How is your participation recorded? If you went back to the station and said, why can't I remember what it was, where would you go to check to see what it was?
A. Lieutenant Turano, you sign in and he maintains that.
Q. Is there a departmental requirement of a certain amount of attendance at training

seminars during the course of the year?
A. Not really.
Q. Is that one of the roles of the training officer, to make sure no one hides successfully for their entire career, does he keep track of who has done what and go around to people or suggest to the Chief that he ask so and so to, how is that supervised or monitored?
A. If you are in patrol, the training sessions are established so that it is done during your normal working hours and you are expected to attend.
Q. All patrol officers?
A. As an administrator, I am allowed for leniency.
Q. Are the patrol officers required to attend every training session given during their shift?
A. If they are working, they will attend the training.
Q. If they are on, they are at the training for some portion of that shift?
A. Yes.
Q. Do the classes last typically the same

Q. Officer Brancato?
A. Yes.
Q. Joe Touro?
A. Yes.
Q. And Chief Scuncio from Hopkinton?
A. Yes.
Q. When did you talk to Chief Scuncio?
A. Approximately 9:15 that morning.
Q. Did you call him or did he call you?
A. He called me.
Q. Why did he call you?
A. He heard that an arrest was made involving a Hopkinton official and wanted to know the details of the arrest. Usually he would call the Chief, my Chief. My Chief was off that day.
Q. What did he say, as best you can remember?
A. It will not be verbatim.
Q. The best you can remember, the substance as best you can recollect it.
A. He heard that a Hopkinton official had been arrested. He asked me who the official was and what the charges were.
Q. What did you tell him?
A. I told him that Mr. Mauti had been

they are. I also have friends that live in Hopkinton. I am not sure which phone he called me on.

Q. When I asked if you had said anything else to Chief Scuncio, you first responded, about Mr. Mauti or generally, and I said about Mr. Mauti; what else did you discuss with him other than Mr. Mauti during that conversation?

A. The previous day there was a fire, a structure fire at the Bradford Dyeing Association, we refer to it as BDA, and we talked about that.

Q. You were up early that morning on the 9th?

A. Yes.

Q. You were at the fire?

A. Yes.

Q. And Chief Scuncio was at the fire?

A. At some point he came, yes.

Q. And you had a discussion with him at the Bradford Dyeing site, this would have been the morning of the 9th?

A. Yes.

Q. Did it any in way concern Mr. Mauti?

A. Absolutely not.

road, yes.
Q. You did not know whether the vehicle was registered until you got back to the station?
A. That's correct.
Q. You ran the license check on Mr. Mauti using the number from the Arizona license, or you just asked dispatch to run it using his name?
A. I asked dispatch to run Arizona and Rhode Island.
Q. Did you ask dispatch to run Arizona because he presented you with an Arizona license?
A. Yes.
Q. Now, the Arizona license he presented to you on its face had not expired?
A. On its face, right.
Q. Do you remember what the expiration date was?
A. No.
Q. What came back from dispatch, how soon did they get back to you with an answer to that inquiry?
A. Very quickly. Less than a minute.
Q. You called them after getting the license,

insurance card and registration certificate and taking them back to your vehicle?
A. Yes.
Q. What was the response you got from dispatch?
A. Nothing found in Rhode Island, active Arizona.
Q. Active meaning active license Arizona?
A. Yes, on its face anyway.
Q. And did you not run -- strike that. Did you run another inquiry, NCIC inquiry, at the time of the arrest?
A. Dispatch automatically runs checks when you call something in.
Q. You did not ask them to run the plate?
A. No, I didn't.
Q. That was done back at the station?
A. When I went back to the station, I realized he gave me the wrong registration. That is when I asked them to run the plate.
Q. Let me follow up on that.
MR. GYORGY: As a matter of fact, can you read back that last answer.
(ANSWER READ BACK)
Q. Did you not look at the registration that

he gave you at the time he gave it to you?
A. I did not look at it.
Q. So between the time of his arrest and when you got back to the station, you did not know whether he was driving an unregistered vehicle or not?
A. That is fair to say, yes.
Q. The number you have, do you have a number in your cell phone for the Hopkinton police station?
A. No.
Q. Do you know the number?
A. Yes.
Q. What is the number there?
A. 401-377-7750.
Q. Do you use any other extensions at the department?
A. That is the only number that I know.
Q. Do they have separate extensions at the Hopkinton department, if you know?
A. I don't know.
Q. I think I remember the document you mentioned looking at earlier were the phone records that you said you had retrieved?
A. I retrieved them, yes.

information you need to take to court?

A. Yes.

MR. GYORGY: Off the record.

(OFF THE RECORD)

MR. GYORGY: Back on the record.

Q. I am showing you Exhibit 3, which is a four-page document. The thirst two pages, I believe, are the photographs that were taken at the station of Mr. Mauti. The third and fourth page are the fingerprint cards. Can you confirm that you agree with that?

(WITNESS PERUSES DOCUMENT)

A. Yes, I agree with that.

Q. At the station you took Mr. Mauti's fingerprints, and Officer Brancato took his photograph; is that correct?

A. Yes.

Q. Did you fill out the rest of the fingerprint card?

A. That is done by computer.

Q. Tell me how.

A. There is a computer where all of the booking information goes, Mr. Mauti's name



cd514fb9-8d0b-410a-891e-1db1b8c39b0f

address and all of the questions that are asked. That is transferred electronically to what is called a live scan fingerprint machine that we used to have. There is an arrest number, so all I have to do is highlight that arrest number and this is all backfilled.
Q. You put the arrest number on a form that is on the computer?
A. You just call up the arrest number before I take the prints, so I am associating the print with the person standing there.
Q. So the prints are not taken as an electronic image?
A. They are. It is called live scan.
Q. Are they printed on a card as well?
A. Yes.
Q. What we are looking at here is the copy of the card?
A. Yes.
Q. Did you retrieve this?
A. Did I retrieve?
Q. The copy of the card that we are looking at, Exhibit 3?

A. How did he get it or how did you get?
Q. How did I get it?
A. I don't know how you got it.
Q. Did you make a copy of the card and provide it to counsel?
A. Either I did or the Chief did. I am not sure who did.
Q. You don't know whether you did it or not?
A. I may have. I am not sure if I did. Most likely I did. It was a while ago.
Q. How long ago was it?
A. I am not sure when it was asked of me.
Q. A month, three months, six months?
A. Within the last six months.
Q. But it was not within the last month?
A. I don't know. I don't think so.
Q. You would have been taking time out of Christmas shopping, so maybe early December but not late?
A. I have a very huge case load, one day runs into the next for me. I apologize.
Q. You cannot pinpoint it anymore specifically than to say within the last six months?
A. That would be my best guess.
Q. When you retrieved it, you made a copy of

the fingerprint card itself?
A. Either the card or a copy of the card.
I am not sure which one it was.
Q. When you say a copy of the card, are you
talking about a piece of paper?
A. Yes, like this.
Q. And you are holding up Exhibit 3?
A. Yes, the last page of Exhibit 3.
Q. You were in court with Mr. Mauti twice,
right, before Judge Erickson?
A. Three times.
Q. The last time that you were in court was on
May --
A. It was twice. I apologize.
Q. The last time can only refer to one time,
and that was May 27, I think the date that
the case was disposed of?
A. Yes.
Q. At the conclusion of that hearing, Lise
Gescheidt gave you a copy of an expungement
order?
A. Yes.
MR. GYORGY: Mark this as
Exhibit 13.
(EXHIBIT 13 MARKED FOR IDENTIFICATION)

Q. Take a look at the second page of that order and tell me if that is the expungement that was issued on May 27?
A. Yes, this is a copy of that.
Q. Is that a copy of what Lise gave you at the conclusion of the hearing?
A. Yes.
Q. I am referring to the second page. The first page is a letter sent to the department later, so just referring to the second page of the exhibit, is that a copy of the order that Lise gave you at the conclusion of that May 27 hearing?
A. I believe it is, yes.
Q. Looking at the first page of the letter, if a letter like that came to the department, can you tell me who it would have gone to in the normal course?
A. It would have gone to me, and I would have given it to Mrs. Algiere.
Q. Do you remember getting that letter with the copy of the order after Mr. Mauti's case was disposed of by mail; do you remember seeing the letter?
A. I don't remember, but I know that the

case was ordered seal and I am confident she sent it. I don't dispute she sent it.
Q. The copy of the order you got on the 27th, when you got back to the station, would you have given that to Mrs. Algiere?
A. No, because it was sealed. That was on order to seal.
Q. And that is all that the order was intended to do, as far as you knew?
A. I would have to review that order, which I think is this one. I remember she made an oral motion to expunge and seal.
Q. You don't remember a written motion?
A. I am sure there was, but if you are asking me to recite it.
Q. When you say she made an oral motion, are you talking about the 27th?
A. Yes.
Q. Where is the fingerprint card that is the last two pages of Exhibit 3, where is that now?
A. I don't know.
Q. Where are they kept?
A. The fingerprint cards are kept in the a file. Because this was expunged, I am sure


cd514fb9-8d0b-410a-891e-1db1b8c39b0f

that was destroyed.
Q. Are you telling me that the copy of the fingerprint card that I am looking at in Exhibit 3 was made before the -- let me ask you this way. How do you explain I am looking at the last two pages of Exhibit 3, which is a record of physical identification that ought to have been destroyed, according to the terms of Judge Erickson's order?
MR. COLUCCI: Objection. You can answer, if you know.
A. I am sure that was destroyed, and my understanding is that it was destroyed. There is a copy in the prosecution file.
Q. The prosecution file maintained by whom?
A. By me. Not the department file, that was destroyed.
Q. Are you saying the prosecution file records are not department records?
A. I am not sure what you mean.
Q. You did not represent a private client in this case, did you?
A. No.
Q. To the extent you acted at all, you acted

as a representative of the department in your capacity as the second in command, right?

A. I don't understand.

Q. Were any of the actions you took with respect to Mr. Mauti, Mr. Mauti's arrest or anything else having to do with the records of this case taken in any capacity other than as capacity with the Westerly Police Department?

A. The file that I have is because I believed he was going to sue me, and that is why is there is a prosecution file.

Q. The prosecution file is kept where?

A. On my desk.

Q. Tell me why you thought he was going to sue you?

A. Number 1 is he has a reputation for bringing suit, and I don't always disagree with his reason for bringing suit. This was a very minor misdemeanor that got blown out of proportion, and the conversation that I had with his attorney, Lise Gescheidt, led me to believe that Mr. Mauti would sue me.

Q. Which desk, your desk at work?
A. My desk at work.
Q. Why do you refer to it as the prosecution file?
A. Because I believe that all of the originals were destroyed, or whatever manner they expunge records. I am not involved in the expungement of records.
Q. Other than to give the orders to Mrs. Algiere?
A. Yes.
Q. You believe the originals were destroyed?
A. Yes.
Q. Do you know if the department has a procedure or a practice of responding to requests such as are reflected in Exhibit 13, Lise's letter, requesting that they comply with the order and advising her once they have?
A. I am not sure what the procedure is.
Q. Tell me if I have the sequence right in terms of your preparation of these documents. The first document that you prepared was the citation itself, the ticket; is that correct?

process?
A. For the misdemeanor, no.
Q. Are you talking about the dangerous weapon assault case?
A. That was a felony.
Q. Which one caused you to remember --
A. I remember in '98 I was going through that, and I was not the court officer.
Q. But you were, in 1999 and up until 2001 when you became Lieutenant, the court officer for Traffic Tribunal?
A. Yes, I am pretty sure I was. I am hazy on the dates, but I am pretty sure I was.
MR. GYORGY: Off the record.
(OFF THE RECORD)
MR. GYORGY: Back on the record.
Q. In your affidavit, Paragraph 4, this is Exhibit 2, the last section or the last sentence, beginning with, The actions of construction worker caused me to suspect that there may have been some type of problem/motor vehicle infraction. Should I interpreter that slash as an and/or or something else? Should I read that as some

type of problem and motor vehicle infraction or problem or motor vehicle infraction?

A. I would say it is an and/or.

MR. GYORGY: Thank you. For present purposes, I explained to Michael taking your deposition today because of the summary judgement motion that is pending. You can see by virtue of how tall the stacks of paper are there will be more at some point if the motion is not granted.

(SUSPENDED AT 2:20 P.M.)