# Exhibit I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLES MAUTI :
:
VS. : C.A. NO.: 06-61T
:
LAUREN MATARESE, ET AL. :

DEPOSITION OF DONALD CORNELL, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Noel & Gyorgy, 50 South Main Street, Providence, RI, on October 3, 2006 at 10:00 A.M.

PRESENT:

FOR THE PLAINTIFF............. NOEL & GYORGY, LLP
BY: JOHN R. GYORGY, ESQUIRE

FOR THE DEFENDANT............. OLENN & PENZA, LLP
BY: MICHAEL COLUCCI, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500


d809a6b6-ed43-4215-babe-7f417969f0c3

# I N D E X


| WITNESS | PAGE |
| --- | --- |
| DONALD CORNELL | |
| EXAMINATION BY MR. GYORGY................ | 3 |


# E X H I B I T S


| NO. | DESCRIPTION (PLAINTIFF'S) | PAGE |
| --- | --- | --- |
| 1. | NCIC/RILETS PRINTOUT................ | 6 |
| 2. | DEPOSITION NOTICE................... | 6 |

license checks and stuff for that. He would gain access through that.
Q. The captain is the prosecution officer, does she have occasion to use it for those purposes?
A. Nine times out of ten she would call and ask for the information to be printed up, and she would come down and get it or we would put that in her mailbox.
Q. On occasion, that one time out of ten she may run that herself?
A. She may.
Q. Sergeant Lacey is in charge of RITT?
A. Yes.
Q. Do any of the lieutenants have occasion to use the terminals in dispatch?
A. Again, they have the authority. Do they do it on a daily basis, routinely, no, they do not.
MR. GYORGY: I think that is all I have. Before we go off the record, I have marked as Exhibit 2 the deposition notice for the individual who conducted the May 9 RILETS checks. And I just want to confirm on the record if we can that the

Town does not know who it was and that is why you have given me the opportunity to depose both Mr. Cornell and Karen Greber.

MR. COLUCCI: That's right.

MR. GYORGY: Off the record.

(CLOSED AT 11:40 A.M.)



d809a6b6-ed43-4215-babe-7f417969f0c3

# **Exhibit J**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLES MAUTI :
:
VS. : C.A. NO.: 06-61T
:
LAUREN MATARESE, ET AL. :

DEPOSITION OF MARK WRIGHT, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Noel & Gyorgy, LLP, 50 South Main Street, Providence, RI, on September 12, 2006 at 1:10 P.M.

PRESENT:

FOR THE PLAINTIFF............ NOEL & GYORGY, LLP
BY: JOHN P. GYORGY, ESQUIRE

FOR THE DEFENDANT............ OLENN & PENZA, LLP
BY: MICHAEL COLUCCI, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500



c929c13f-0c45-436d-8940-e27d191d1087

INDEX


WITNESS PAGE

MARK WRIGHT

EXAMINATION BY MR. GYORGY................ 3


EXHIBITS


NO. DESCRIPTION (PLAINTIFF'S) PAGE

2. RILETS............................ 21

Q. When did you become a lieutenant?
A. Two years ago August.
Q. Are you currently the terminal agency coordinator for the Westerly Police Department?
A. Yes.
Q. Can you tell me what that means, just tell me what it means, terminal agency coordinator?
A. Monthly the State Police send us down audits in which I have to check information and make sure it is accurate.
Q. Did you say audits?
A. Yes.
Q. Are these audits of the use of the RILET system by the Westerly Police Department?
A. Audits of the information we have put into the system.
Q. What categories of information you put into the RILET system, am I correct?
A. Yes.
Q. What information do you put into the RILET system?
A. Stolen articles, wanted persons.
Q. Anything else?

A. I would assume.
Q. Do you have any recollection of the State Police having come down and instructing members of the department on restrictions, on the use of the NCIC system?
A. No.
Q. Are you aware that there are restrictions on the use of the NCIC system?
A. Yes.
Q. How are you aware of those restrictions?
A. I can't say how I am aware, I just know there are restrictions.
Q. What are they, to your knowledge?
A. It has to be for law enforcement purposes.
Q. Anything else?
A. Not for personal use or personal gain.
Q. Anything else?
A. No.
Q. Do you know what the sanctions are for misuse?
A. No.
Q. Do you know whether they are civil or criminal?
A. No.

would be something the State Police would document to us.
Q. Are you familiar with the, let me ask you more questions. Are you saying the department is not responsible for monitoring the use of the system, that the State Police would notify the department if there was any misuse?
A. I can't do a blanket statement. If someone had knowledge of someone misusing it in our department, obviously we would act on that with the State Police.
Q. What would you do?
A. We would report that to the State Police and let them know this occurred and what is the next step.
Q. Are you familiar with the circumstances of Mr. Mauti's arrest?
A. Through the arrest, yes.
Q. When you say through the arrest, what do you mean?
A. Through what occurred that morning.
Q. Were you present --
A. No.
Q. How are you aware of what occurred that

morning?
A. Through conversations in the station.
Q. With whom?
A. Just general that Mauti was arrested.
Q. Do you know Mr. Mauti?
A. I know him.
Q. How?
A. Through town. It is a small town. You know people. I don't know him in a personal way.
Q. I understand it is a small town.
A. That is all. I never had dinner with him or drinks or anything like that. I just know him.
Q. Were you aware of the problem he had with the town with a storm drain in the side yard, did you see any of those articles in the Sun?
A. Yes, through the Sun.
Q. So you don't remember any specific conversations with people you can identify around the time of Mr. Mauti's arrest about the circumstances of his arrest?
A. Other than he was driving down the road and he was stopped by the Captain.

Q. Do you know why he was arrested?
A. Because a license check was performed and it came back that he did not have a Rhode Island license.
Q. Do you know he was arrested for not having a Rhode Island license even though he had an active Arizona license?
A. Yes.
Q. Did you have discussions with anyone at the department about whether that is an arrestable offense?
A. I am sure I did.
Q. Do you remember who?
A. I think the Chief.
Q. Who initiated that conversation?
A. I don't know.
Q. Was anyone else present besides you and the Chief?
A. I don't recall.
Q. What did the Chief say about it?
A. I don't recall. I gave my opinion on it.
Q. What was your opinion?
A. That I had never seen anybody arrested for that before.

Q. Did you say anything about that violation being a Traffic Tribunal offense?
A. That is how I have always handled them when I was in patrol.
Q. How long were you on patrol?
A. Nine years, approximately.
Q. I may have asked the question wrong, but were you a patrolman for nine years?
A. Yes.
Q. Then you were promoted to corporal?
A. Actually, corporal is still patrol. I was a patrol for five or six or seven years and then corporal, and then I went into detectives and spent my career there.
Q. You spent nine years on the road?
A. Yes.
Q. From 1988?
A. '87.
Q. From 1987 to 1996?
A. Thereabouts.
Q. Did you tell the Chief that you had always treated it as a traffic Tribunal offense?
A. Yes.
Q. Do you remember what the chief said in response?

A. No. Not to I point where I could say, no.
Q. Do you remember specifically what he said? Do you remember whether he expressed agreement or disagreement with your opinion?
A. I can't say for sure. I would assume, but I don't want to assume.
Q. But you don't remember him expressing either one?
A. It was conversation that the memory of it was gone within five minutes because it did not affect me one way or the other.
Q. Do you remember when that conversation occurred?
A. No.
Q. Was it soon after the arrest?
A. I don't remember.
Q. Was it closer in time to last May than the present?
A. Yes.
Q. Did you have discussions with anyone other than the Chief?
A. Not that I can recall.
Q. Do you know whether the topic of

Mr. Mauti's arrest was discussed by others in the department, whether you participated in the discussions or not?

A. I am sure it was. I don't put myself in a situation where subordinates are talking about a superior. I either leave the room or I don't put myself in that situation.

Q. What you know of Mr. Mauti's arrest is what you learned from the discussions you had with other people in the department; is that correct?

A. Well, that and the paper.

Q. What paperwork did you see?

A. Westerly Sun.

Q. What do you remember of the Westerly Sun's coverage?

A. That he was arrested for operating without a license and subsequent stories after that were in it. It said other things regarding him suing the town for false arrest and that type of stuff or whatever.

Q. Let me ask you a question. You said to the Chief that you had not treated the offense

Mr. Mauti was arrested for as a criminal offense, but instead treated it as a Traffic Tribunal offense; is that correct?
A. Yes.
Q. Did you, or do you, because you are still a police officer you may have occasion to conduct traffic stops, draw a distinction in terms of driving with no license and driving with an active out-of-state license?
A. Yes.
Q. What is the distinction that you draw?
MR. COLUCCI: Objection. You can answer.
A. The distinction would be driving without a license. There is the summons for driving with an out-of-state license if you can prove they have been in the state for longer than 30 days that is summons not an arrest.
Q. In one case there is no license and in the other case there is the wrong license, is that an accurate description?
A. Yes, just not a Rhode Island license, yes.

# Exhibit K

# State of Rhode Island

## Rhode Island State Police

This is to certify that

LAUREN MATARESE

*has successfully completed a course of instruction in*

INTRODUCTION TO RILETS / NCIC POLICY & PROCEDURES

Witness my hand and seal this 23RD day of MAY, 1989 A. D.,

Walter Stone

Colonel
Superintendent
Rhode Island State Police

# CERTIFICATE OF ACHIEVEMENT

*certify to all that*

Sgt. Lauren Matarese

*has successfully completed instruction of the NCIC Policies, Procedures and Guidleines as set forth by the Federal Bureau of Investigation and the Rhode Island State Police.*

Westerly

*Department*

September 1996

*Date*

*Rhode Island State Police Control Terminal Officer*

NCIC

© GOES 671

LITHO IN U.S.A.

# CERTIFICATE OF ACHIEVEMENT

*This certifies that*

SERGEANT LAUREN MATARESE

*of the*

*Westerly Police Department*

*has successfully completed re-certification of the NCIC Policies, Procedures and Guidelines as set forth by the Federal Bureau of Investigation and theRhode Island State Police*

WESTERLY R. I. POLICE

*Lt. Stephen N. Baker*

Director Of Training - Westerly Police Department

*John R. Moretta*

Terminal Agency Coordinator - Westerly Police Department

*July 14, 1999*

# **Exhibit L**

UNITED STATES District Court
FOR THE DISTRICT OF RHODE ISLAND

CHARLES MAUTI :
:
VS. : C.A. NO.: 06-61T
:
LAUREN MATARESE, ET AL. :

DEPOSITION OF SEAN LACEY, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Noel & Gyorgy, 50 South Main Street, Providence, RI, on September 29, 2006 at 10:00 A.M.

PRESENT:
FOR THE PLAINTIFF............ NOEL & GYORGY, LLP
BY: JOHN R. GYORGY, ESQUIRE

FOR THE DEFENDANT............ OLENN & PENZA, LLP
BY: MICHAEL COLUCCI, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

# I N D E X


| WITNESS | PAGE |
|---|---|
| SEAN LACEY | |
| EXAMINATION BY MR. GYORGY................ | 3 |


# E X H I B I T S


| NO. | DESCRIPTION (PLAINTIFF'S) | PAGE |
|---|---|---|
| 1. | NCIC/RILETS PRINTOUT................ | 33 |

anyone else?

A. There are two sergeants assigned to first shift, my being one of them. I am the senior sergeant. I am on a 5/2 schedule. I am the only sergeant on a 5/2 schedule, the reason for that is I handle prosecution for the court.

Q. Do you assist Captain Matarese?

A. No. I handle prosecution for the Traffic Tribunal and I handle prosecution for the Municipal Court. She handles prosecution for the District Court.

Q. The other sergeants work four days on and three days off?

A. 4/2. Their days off rotate and I am on a fixed schedule.

Q. When did you start doing the Traffic Tribunal prosecutions?

A. 2003.

Q. What does that is entail, what are your responsibilities in terms of being the sergeant in charge of RITT proceedings?

A. I am responsible for, we have a day we are assigned for court. I am responsible for all arraignments, any plea agreements

reached on that level. I am responsible for the motor vehicle violations that are issued to the police department. I am responsible to assign the officers if they are, in fact, scheduled to go to trial for a ticket or refusal hearing. That is the Traffic Tribunal. As far as the municipal side, I am responsible for the prosecution for all municipal cases that go to court, some of the which can be criminal cases, any violation of any town ordinance. The same thing in the arraigning. I will do the arraignment. If it is going to trial, I will schedule the officer to go to trial. Westerly has a concurrent traffic system, in other words, half of the tickets go to Municipal Court if it is a concurrent charge. Some violations have to go to RITT. You have no choice. That is all an issue. The town gets more funds if we send them to Municipal Court than if we send them to Traffic Tribunal.

Q. What offenses are included in the concurrent, where the Municipal Court and Traffic Court have concurrent jurisdiction?

knowledge of it.
Q. When you say a license issue, do you know what the specific offense was that he was charged with?
A. Yes.
Q. What was it?
A. He was charged with 31-10-1, which is operating without a license.
Q. A 31-10-1 is applicable in a situation where the driver has no license, either Rhode Island or out of state?
MR. COLUCCI: Objection. You can answer.
A. No, it is not.
Q. What is your understanding of what 31-10-1 does apply to?
A. My understanding is 31-10-1 is no longer used. It now falls under 31-11-18, which is a suspension statute.
Q. When you say it is no longer used, what do you mean by that, that the department does not use it, that it has been repealed or what?
A. I am not sure. I couldn't tell you exactly why it is not being used. Some

time ago all licensing issues fell under 31-11-18 to no license whether suspended, cancelled, revoked, it is actually a District Court offense, which is you go to District Court. 31-10-1 would go to Rhode Island Traffic Tribunal. It had to go to the Traffic Tribunal.

Q. But it was a Traffic Tribunal offense as opposed to a District Court offense?

A. That's correct.

Q. 31-10-18, is that the other section you mentioned?

A. 31-11-18, suspended, cancelled, revoked.

Q. Does that apply to a situation where a driver has a valid out-of-state license?

A. No, it does not.

MR. COLUCCI: Same objection. You can answer.

Q. As the prosecuting officer for, is that the right term, prosecution officer for RITT and Municipal Court?

A. Yes.

Q. As the prosecuting officer, are you required to have a knowledge of at least



2706011b-0238-4ae3-97eb-8921e8c02617

A. Yes. He was working some security job or police job with the Grand Ole Opry and he was applying to go to some dispatching job or a police job somewhere down there. I don't recall exactly what it was.
Q. Do you know anybody else that may have been in touch with him who would know where he is now?
A. No. I imagine he has been in contact with some of the people on third shift. I am trying to think. Dave LaChapelle. I have not heard anyone mention they have talked to Mike.
Q. Can you think of anybody else who might know besides Corporal LaChapelle?
A. No, other than the people that worked with him on third shift. I don't know anybody in particular that I can say this guy knows.
Q. Did you ever discuss Mr. Mauti's arrest with Captain Matarese?
A. I am sure at some point I did.
Q. Do you remember at what point?
A. I imagine when it was, I imagine around the time he was arrested.

Q. What do you remember about that discussion?
A. I couldn't tell you how, but something regarding the arrest came up and I expressed my concerns. I said, I don't think you charged him under the right statute.
Q. Do you remember whether that conversation occurred before or after Mr. Mauti's District Court prosecution?
A. I don't know. I have no idea.
Q. What was her response?
A. She indicated she believed it was the correct statute. I argued the fact that I said no, it is not.
Q. How many times did you go back and forth?
A. I don't know. She is a tough person. I don't know. Three or four, maybe.
Q. Was that discussion only about whether or not it was the correct charge?
A. Yes.
Q. Did you ever discuss with her -- first of all, did you ever hear anyone suggest that Mr. Mauti's arrest was done as a favor to chief Scuncio in Hopkinton?
A. Yes, I had.

Q. Where did you hear that, or from whom?
A. I couldn't begin to tell you. It is general gossip around the station during all of these conversations.
Q. Did you ever ask Captain Matarese about that?
A. I don't think I did. She may have told me that she did not do it as a favor for Mr. Scuncio.
Q. Does she know Chief Scuncio?
A. Absolutely, yes.
Q. Has she worked with him?
A. He was on State Police for 25 years. He has been in Hopkinton for ten years. I am sure she worked with him on different things.
Q. When I asked if she knew him, you said, absolutely, yes. Why did you say absolutely yes?
A. I have been there nineteen years and I know Jack Scuncio. I have been involved in different things over the years. He knows me and I know who he is. I know she talks to him.
Q. When did she tell you that she did not

arrest Mr. Mauti as a result of a request
or a favor to Chief Scuncio?
A. I would guess around the time of the
arrest. I can't give you an exact time. I
don't know. During conversation at some
point around the time of the arrest.
Q. Do you know, you refer to it as gossip, do
you know how it got started?
A. No. It is worse than a social club
down there. I don't know how it got
started. I have no idea. It was general
knowledge or general talk that she was
allegedly doing Jack a favor by arresting
the guy.
Q. Did you ever talk to any of the officers in
Hopkinton about Mr. Mauti's arrest?
A. No, I have not.
Q. Do you talk with officers on the Hopkinton
force?
A. Very rarely.
Q. Do you know anybody on the Hopkinton force
other than in passing, are you friendly
with any of the officers over there?
A. Yes. I would not say friends hanging
out with them, but I know several of the

people on the department. If I pass them, you say hello to them. You certainly acknowledge them.

Q. I think you said you did not ask Captain Matarese -- let me ask you this way. Am I correct that you did not ask Captain Matarese about whether Mr. Mauti's arrest was done at the request of or as a favor to Chief Scuncio; is that correct?

A. That's correct.

Q. But she said something to you about it?

A. Yes, she did.

Q. What was the occasion for her to mention that subject to you without you raising it in the first place?

A. Assuming probably because it was a general gossip around the department, I happen to be one of the people that would tell her what I think about things and she knows that. We had conversations prior that I felt as though it was the wrong charge he was charged with, he was not charged appropriately. Maybe she felt she had to come up to me and let me know that did not happen. I assume she assumed that

I heard that, that that was the situation.
Q. Her comment was by way of her attempting to squelch the rumor; is that accurate?
A. I would say yes.
Q. Did you ever talk to Chief Mello about it?
A. I don't recall. I would imagine I probably did mention it to him or discussed it at some point over the last year and a half, that I felt as though it was charged inappropriately.
Q. What was his response?
A. I don't believe I got a response.
Q. Did you tell him that in a face-to-face discussion or in writing?
A. It would have been face to face. There would not be anything in writing. It would be face to face.
Q. Do you remember the occasion of that discussion?
A. No. It was at the station. We were both working, obviously.
Q. Did you ever talk to him about the statements that people thought the arrest was a result of a request from or a favor to Chief Scuncio?

A. No, I didn't discuss that with him.
Q. Do you know if he is aware of that issue?
A. I am sure he is aware of it.
Q. Did you know whether he ever talked to her about it?
A. No, I don't know. I couldn't tell you if he has ever discussed that with her.
Q. When you say he is aware of it, why do you say he is aware of it?
MR. COLUCCI: Objection. You can answer.
A. Because the general knowledge, is I am sure somebody went up to him. There is not much that happens around the place that everybody does not hear about. I know there are lieutenants that have heard it and I am sure they went to him. I did not discuss it with him, I just had general knowledge. I assume he knows about it.
Q. I am just trying to find the basis for your assumption. As I understand it, the basis for your assumption is it was discussed with frequency such that you would have had to have your ears plugged not to hear it?
A. There are other members of the

administration that have knowledge of the supposed favor or whatever it was. I am sure they went back to him.
Q. Who are you referring to when you say there are others that have knowledge of it?
A. To be honest with you, I don't think there's anybody on the police department that does not have knowledge of it other than new people hired since then. They really have no knowledge of it.
Q. Do you know whether the department ever did anything to find out whether it was true?
A. I have no idea. I don't know. As far as an internal investigation goes?
Q. Yes, a formal or informal.
A. I don't know.
Q. Did you ever discuss that with Lieutenant Toscano?
A. I am sure I have at some point.
Q. Do you remember what you said to him or what he said to you about it?
A. I can't recall exactly, but I am sure we discussed it at some point.
Q. Under what terms did you discuss it, in terms of the charge?