# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLES MAUTI :
:
vs. : C.A. NO.: 06-61T
:
LAUREN MATARESE, ET AL. :

DEPOSITION OF DAVID LACHAPELLE, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, Notary Public in and for the State of Rhode Island, at the offices of Noel & Gyorgy, LLP, 50 South Main Street, Providence, RI, on September 12, 2006 at 10:00 A.M.

PRESENT:

FOR THE PLAINTIFF............. NOEL & GYORGY, LLP
BY: JOHN P. GYORGY, ESQUIRE

FOR THE DEFENDANT............. OLENN & PENZA, LLP
BY: MICHAEL COLUCCI, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

I N D E X


WITNESS PAGE

DAVID LACHAPELLE

EXAMINATION BY MR. GYORGY................ 3


E X H I B I T S


NO. DESCRIPTION (PLAINTIFF'S) PAGE

1. NCIC CHECK......................... 116




37bfeefe-4076-4dc2-a308-bd4d2d4671e9

A. Yes.
Q. Do you remember if you were working third shift at the time?
A. Yes, I was.
Q. Were you in charge of the third shift at the time of Mr. Mauti's arrest in May of 2005?
A. Yes.
Q. Is it correct to call you the shift supervisor; is that the right term?
A. Yes.
Q. How long had you been a shift supervisor in May of 2005?
A. Just less than five years.
Q. Just less than five weeks?
A. Years.
Q. Okay. I didn't hear your answer. Does that mean that when you went to first shift you were also a shift supervisor?
A. At times.
Q. Is a shift supervisor's position based on seniority?
A. Yes.
Q. Are you the only person with as much seniority as you have who is crazy enough

You can answer.
A. Not as a matter of routine.
Q. When will it be given or not given?
A. If you question a subject about a crime, there will be Miranda rights.
Q. And if you are not going to question them, no Miranda warning?
MR. COLUCCI: Objection. You can answer.
A. Right.
Q. Do you remember the circumstances of Mr. Mauti's arrest last May?
A. Yes.
Q. Tell me what you remember about it?
A. I was supervising the third shift, midnight to eight. I was sitting at my desk. I heard Captain Matarese on the radio making a traffic stop. I don't remember what the place was or if she was actually calling out with it, I just know it was a traffic stop. She made another radio transmission running a check on, I assume, operator or somebody in the vehicle. I didn't hear the name. It was just background noise that you are used to

of people talking on the radio. And my dispatcher at that time was Michael Fay. And I heard Dispatcher Fay's transmission as nothing found in Rhode Island as far as a license, but active in Arizona. I again filtered out the background noise. And Dispatcher Fay came to me and said, do you know who that is she just ran? I said no, Michael. Who is it? And he told me the name of Mauti. And I said, who is he? And he told me that he is somebody from Hopkinton who is having problems up there and he works for the town. I said, okay. That was about the end of our conversation right then. Then I heard Captain Matarese on the radio again asking for a transport officer. Dispatcher Fay sent officer Brancato to the Captain's location. And then I went into the dispatch area and asked Dispatcher Fay, who is she transporting? And he told me he did not know. So I confirmed with him what I heard. I said, is it this Mauti person she ran? He said, I don't know if that is who is being brought in. I asked Michael, does

he have a license? He said that he had an active license in Arizona but nothing on file in Rhode Island. I said, okay. And I went back to my desk and waited for the Captain.

Q. Who then came to the station?

A. Captain Matarese.

Q. Did she?

A. Yes.

Q. How soon after the last part of your discussion with Michael Fay?

A. Under five minutes.

Q. When did Officer Brancato arrive?

A. I am not sure of the exact time.

Q. So Captain Matarese came back first?

A. As far as I know. She was the first person I saw.

Q. Did you discuss with her Mr. Mauti's arrest?

A. Yes.

Q. Who initiated that discussion, did you ask her about it or did she come in and tell you about it?

A. I asked her.

Q. What did you say to her?

A. I asked, what he is being charged with?
Q. What did she say?
A. Driving without a license.
Q. Without forcing me to say, what did you say and what did she say, can you repeat as best you remember what each of you said, not summarizing it, but if you can remember what the form of what people were saying, fine. If you have to describe the substance, it was a long time ago, I recognize, but what she said and what you said. What did you say in response to driving without a license?
A. I said, he has an active Arizona license. She replied, well, he does not have a Rhode Island license and he has lived in Rhode Island for more than 30 days. I said, okay. Normally we just write an RITT summons for that and not bring them in.
Q. RITT being Traffic Tribunal?
A. Rhode Island Traffic Tribunal.
Q. What did she say?
A. It is an arrestable offense and people get arrested for it all of the time. I

said, I personally cannot remember arresting anybody for that offense.
Q. And what did she say?
A. She said it is in the statute. We have a book shelf there with the law books and she picked up the law book and turned to 31-10-1.
Q. Did she show it to you, did she read it herself?
A. She read it herself. She showed it to me and where she pointed out she said, that covers this particular situation with not having a Rhode Island license.
Q. When you say that covers this particular situation and you were pointing with your finger on the table, was she pointing to 31-10-1?
A. That statute, yes.
Q. And what did you say?
A. I read it. I said, okay.
Q. Was that the end of the discussion?
A. Pretty much.
Q. When you say pretty much, was there some small part of it, did she say something else?

A. I said, I never arrested anybody for that. I have given them an RITT motor vehicle violation.

Q. Do you know of anyone else in the department who has ever arrested someone for violating that statute without there being some other offense?

A. Well, that statute --

MR. COLUCCI: Objection. You can answer.

THE WITNESS: People have been arrested for that.

Q. For violating 31-10-1?

A. Yes.

Q. Let me ask it a different way. Are you aware of any other custodial arrests of anyone in Westerly for not having a Rhode Island license if they had an active license from another state?

A. I have no knowledge of that.

Q. Did you have any further discussion with Captain Matarese that morning?

A. Not that I can recall.

Q. Did you have any discussion with her about Mr. Mauti's arrest subsequent to that

morning?
A. I don't believe so.
Q. When you said it sounded as though the discussion came to a conclusion, I think you said, I think that was pretty much it when you said okay. And your tone of voice suggests that it was okay, but you did not necessarily agree with her opinion on the meaning of the statute; is that fair to say?
A. Yes.
Q. Did you end the discussion because -- strike that. Let me ask you that question. Did you not pursue the discussion because she is your captain and your supervisor?
A. Yes.
Q. And it would not have been appropriate to disagree with her on that point?
A. Correct.
Q. Did you tell her that you thought Mr. Mauti's arrest was improper?
A. No.
Q. Did you say anything to her about what Michael Fay had told you about Mr. Mauti's problem in Hopkinton?

A. No.
Q. Did you talk to Michael Fay about Mr. Mauti's arrest after your discussion with Captain Matarese?
A. Yes.
Q. When did you talk to Michael Fay again?
A. It would have been the next shift we worked together.
Q. What was the occasion for talking to Mr. Fay again, how did it come up?
A. He initiated the conversation about it.
Q. When did he initiate the conversation?
A. When we were working. I don't know the exact time.
Q. The next day on third shift?
A. Yes. It would be the next day.
Q. Were you the shift supervisor the next day?
A. I don't recall.
Q. Do you recall whether or not there was a discussion around Mr. Mauti's arrest during roll call the next day?
A. I turned it over to the day shift supervisors. I said Mr. Mauti had not been fully processed yet, so I just advised the next supervisor of what was going on and I

was not at roll call.
Q. When I said roll call the next day, I was thinking in third shift terms?
A. My next shift?
Q. Yes, your next shift where you were the supervisor.
A. I am sure there was discussion about that.
Q. Do you remember what the discussion was, the substance of it or who participated?
A. Not exactly, just the fact that it was Mr. Mauti. I don't know, obviously he was not well loved in Hopkinton. I don't read newspapers or anything, so I don't know the guy. And there are people that know stuff who were talking.
Q. Was it a general discussion at roll call the following third shift?
A. Pretty much, because of the charge.
Q. Why do you say that? You mean because of the charge, are you saying because it was a custodial arrest for not having a Rhode Island license?
A. Yes.
Q. Do you remember what the opinions were that

were voiced about that issue?
A. The general consensus was again the RITT summons.
Q. Did anybody say anything about being aware of someone having been subject to custodial arrest for that offense?
A. I don't recall that.
Q. Do you remember who worked the following third shift?
A. No.
Q. How many officers were on third shift last May?
A. Depending on the day of the week, minimal manning Monday through Thursday, sorry, Sunday through Thursday is four, and Friday and Saturday is five on third shift.
Q. Do you know who those four or five people would have been last May?
A. No.
Q. Who are they now?
A. People have different schedules. I can tell you who worked last night, but everybody has different days off and you change shifts and you change days off.
Q. Can you tell me who works third shift, not

else?
A. I couldn't give you an honest answer for that.
Q. More than five?
A. More than five.
Q. More than ten?
A. No, not more than ten. Myself personally, no.
Q. To your knowledge, was Mr. Mauti's arrest a subject of discussion generally in the department?
A. Generally, no.
Q. Was it a subject of discussion among the patrol officers?
A. Not all.
Q. Was it ever the subject of written memorandum or directive in the department, that you saw?
A. Not that I recall, no.
Q. Were there any discussions at subsequent roll calls about traffic offenses? Let me back up. Were there ever any discussions at roll call subsequent to Mr. Mauti's arrest about what traffic offenses constituted arrestable offenses and what

traffic offense did not constitute arrestable offenses?
A. Yes.
Q. When did that occur?
A. I don't know the exact date.
Q. That would not surprise me, but if you could give me your best estimate in terms of the month or how long after Mr. Mauti's arrest, do you think?
A. I have no idea. So much goes through that roll call binder, changes in laws and so on and so forth.
Q. So something appeared in the roll call binder concerning arrestable versus nonarrestable traffic offenses; is that accurate? Which offenses you can arrest people for and which you give them a ticket for?
A. Not in the way you are saying it.
Q. Say it in your way. Whatever it was, did you see it as shift supervisor?
A. I don't recall it. I just know that memos go through about law changes. There could have been a change in the law that was arrestable and now isn't. It could be

that came across as a memo in that roll call binder. I couldn't tell you exactly when, where or what it said.
Q. Was it closer in time to last May or the present?
A. I can't answer that with any accuracy.
Q. When it did come through, it was at a time when you were shift supervisor?
MR. COLUCCI: Objection to the form. You can answer.
A. I generally supervise two of my four nights every week. So I would have to say the odds were that it came across while I was supervisor at some point, yes.
Q. When you say it came across at some point when you were supervisor, do you mean it went into the roll call binder and stayed there long enough so that it was there on a night when you were supervising?
MR. COLUCCI: Objection. Clarify what it is, when you say it.
Q. Let me back up. You said at some point something came through in writing and was put in the roll call binder about what traffic offenses are arrestable offenses

and what traffic offenses are not arrestable offenses; is that right?

MR. COLUCCI: Objection to the form. You linked it to his prior testimony and that was not the prior testimony. You can start over again and go there again. My objection is your link to the prior testimony.

MR. GYORGY: That is fine. Read back the question.

(QUESTION READ BACK)

Q. Do you know the question?

A. Yes.

Q. Can you answer it?

A. Yes.

Q. What is the answer?

A. To that question is yes.

Q. And did you have occasion to read that document, whatever it was, the document I just described, did you have occasion to read that to the third shift officers in your role as shift supervisor?

A. Yes.

Q. Do you remember how long that memo stayed in the binder, in the roll call binder?

A. You said it was a memo.
Q. Do you remember how long that document stayed in the roll call binder?
A. It was probably a few weeks.
Q. What was the document?
A. The RITT schedule that changes traffic laws and fines.
Q. Is that something published by Traffic Tribunal?
A. Yes.
Q. Do you remember during the period that document was in the roll call binder, if it ever prompted a discussion about what happened to Mr. Mauti?
A. No, not that document.
Q. Was there anything else that prompted a discussion at roll call about Mr. Mauti's arrest?
A. I don't recall.
Q. Did you discuss Mr. Mauti's arrest at any time last May with anyone else in the department other than Captain Matarese?
A. Yes.
Q. With whom?
A. The day shift supervisors that were

relieving me that morning.
Q. Who were they?
A. Sergeant Lacey.
Q. What is Sergeant Lacey's first name?
A. Shawn.
Q. Was there another first shift supervisor?
A. Sergeant Stono Trombino (phonetic).
Q. Did you have discussion with Sergeant Trombino and Sergeant Lacey, did you have a discussion with both of them at the same time?
A. Yes. They were changing into their uniforms.
Q. Is that typical, that as the shift supervisor is leaving you will have a conversation with the shift supervisors coming in?
A. Yes.
Q. Is that part of the roll call?
A. Not roll call, just shift change.
Q. Was it a discussion among you three or was someone else there?
A. I just remember those two.
Q. Were all three of you present for the entire discussion?

A. Yes.
Q. What did you tell them about Mr. Mauti's arrest?
A. That he was being processed by Officer Brancato and I have been advised by the Captain he would be released with a summons so there's no one to bring to court.
Q. No one to transmit to court that day?
A. Yes.
Q. Did you tell them the circumstances of the arrest?
A. Just that it was a car stop.
Q. Did you tell them it was a license offense?
A. Yes.
Q. Did you explain to them that it was a license offense where Mr. Mauti was arrested because he did not have a Rhode Island license?
A. Yes.
Q. Did you tell them that he did that have what you called an active Arizona license?
A. Yes.
Q. Did you tell them about your discussion with Captain Matarese?
A. Yes.

Q. What was Sergeant Lacey's reaction to what you told him about Mr. Mauti's arrest?
A. He felt as I did, it was an RITT offense.
Q. It was a Traffic Tribunal offense?
A. Yes.
Q. Did you say anything about prior arrests or prior tickets for that offense?
A. That is two separate things.
Q. You are right. Did either of them, did he say anything about the knowledge of anyone ever having been arrested for that offense?
A. Did he say, no, I don't believe he did.
Q. Did he express surprise that Mr. Mauti had been arrested instead of receiving a ticket?
A. Yes.
Q. What about Sergeant Trombino?
A. Same effect, surprise that he was arrested.
Q. Was it a surprise that he had been arrested because of the nature of the offense?
A. Yes.
Q. Did either of them -- do you know when the last time prior to that was that you're

aware that Captain Matarese had conducted a traffic stop?
A. No, not exactly. She does make them.
Q. She does make them?
A. Yes. I have heard of her making them in the past, yes.
Q. Did Sergeant Lacey or Sergeant Trombino say anything else in response to what you told them about Mr. Mauti's arrest?
MR. COLUCCI: Can you we take a five-minute break.
MR. GYORGY: Let him answer the question.
(QUESTION READ BACK)
A. Yes. They said something.
MR. GYORGY: Off the record.
(OFF THE RECORD)
MR. GYORGY: Back on the record. Read back the last question and answer.
(LAST QUESTION AND ANSWER READ BACK)
Q. What did Sergeant Lacey say?
A. As far as about the Mauti arrest?
Q. Yes.
A. He asked me if I knew who Mr. Mauti was

and I said no.
Q. What did he tell you?
A. He told me that he works with the Town of Hopkinton in some capacity. I don't remember the exact words.
Q. Is that all he said?
A. He worked for the Town of Hopkinton and something to the effect, I don't know the exact words, that he has a problem with the Town of Hopkinton or something of that nature. I don't remember the exact wording of it.
Q. Did he say anything about the police chief in Hopkinton, Chief Scuncio?
A. He mentioned Chief Scuncio's name.
Q. Do you know why he brought that up? Do you remember why he brought that up? Did he say why he mentioned that?
A. He said Mr. Mauti and Chief Scuncio had an internal problem going in Hopkinton, something about zoning or properties. I was not really paying attention.
Q. Did he suggest at that Mr. Mauti's arrest had something to do with that?
A. No. I would not say he made a

suggestion, he just brought up the fact.
Q. Did anybody say anything about the arrest being related to Mr. Mauti's disagreements with Chief Scuncio, any of the three of you, yourself, Sergeant Lacey or Sergeant Trombino?
A. I don't know which one, but there was a reference to that, because of Chief Scuncio. I don't know which Sergeant.
Q. When you are saying there was a reference to it, when you referred to making reference to it, are you saying someone made reference to the arrest or the possibility that Mr. Mauti's arrest that morning had something to do with his dispute with Chief Scuncio?
A. Yes.
Q. Was it either Sergeant Trombino or Sergeant Lacey?
A. They were the only two in the room, so one of them must have.
Q. It was not you who suggested that possibility, it was one of the two of them?
A. Yes.
Q. Was there any discussion of that

possibility after the suggestion was made?
A. Yes.
Q. Tell me about that suggestion?
A. Whichever one said that to me, that Mr. Mauti and Chief Scuncio had a problem with each other in the Town of Hopkinton and that they felt, whichever one said it, that she was probably doing Scuncio a favor. That is not my business.
Q. Did you understand -- whoever said that, did you understand them to mean that Mr. Mauti's arrest was made at the request of Chief Scuncio?
A. Well, I would not use request.
Q. What would you use?
A. I would use as a favor.
Q. Do you know whether or not Captain Matarese ever discussed Mr. Mauti's arrest with Chief Scuncio?
A. I don't know.
Q. Do you know whether Captain Matarese knows Chief Scuncio?
A. I am sure she does. I don't know personally.
Q. Why are you sure she does?

A. Neighboring police departments, both high-ranking administrators, they are bound to know each other.
Q. Was there any further discussion in response to this suggestion that the arrest may have been a favor to Chief Scuncio?
A. No. It was the end of my shift and I was leaving.
Q. Did you respond to that discussion, did you say anything in response?
A. It is not my affair.
Q. Whoever suggested that possibility, did the other Sergeant respond to it?
A. I don't recall.
Q. Was there any further discussion between the three of you about it?
A. No. I left. I was off duty.
Q. Did you talk to either Sergeant Lacey or Sergeant Trombino about Mr. Mauti's arrest after that?
A. Yes. Probably the next morning, my next full shift coming in. At the change of shift the following day.
Q. How did the subject come up at the change of shift the following day?

A. I asked if they had summoned Mauti out. The Captain had said and they said they had. They told me the town manager called over looking for Captain Matarese after I left and they assumed it was about Mr. Mauti.

Q. They told you this at the change of shift on the 11th, the following day?

A. Yes, the 11th.

Q. Did they tell you anything else?

A. Not that I recall.

Q. Do you remember which one of them told you that?

A. No. It is a small room and there are two people and myself.

Q. Did you respond to what they told you on that change of shift?

A. The next day?

Q. When they told you that the town manager had called and they assumed it was about Mr. Mauti's arrest, did you respond to their telling you that?

A. Yes.

Q. What did you say?

A. I said, what happened after that?

Q. That is what I am going to ask you. What
did happen after that, did they respond,
did they tell you?
A. No. They did not tell me. They just
said that she left.
Q. Meaning, as you understood it, she left to
go to the town manager's office?
A. I don't know where she went.
Q. Was Joe Touro the town manager at the time?
A. Yes.
Q. Did you ever hear anything else about -- do
you know whether she discussed Mr. Mauti's
arrest with the town manager?
A. I don't know.
Q. Did you ever hear anything else about the
town manager being interested in the
circumstances of his arrest?
A. Yes.
Q. What did you hear after that?
A. I heard that he had Captain Matarese
personally bring him to the registry to get
a Rhode Island license.
Q. Who did you hear that from?
A. Either Sergeant Trombino or Sergeant
Lacey. Those are the two I deal with the

most in the morning.
Q. Did you hear it at change of shift the next day?
A. Yes.
Q. Why did they mention that to you?
A. I don't know. It was part of the Mauti conversation. I asked what had happened and that was part of it.
Q. Is it unusual for the arresting officer to take a person to the registry under those circumstances?
A. Yes.
Q. Is it very unusual?
A. Yes.
Q. Is it appropriate in terms of the department rules and regulations?
MR. COLUCCI: Objection. You can answer.
A. I don't think it has ever been done before.
Q. So unusual, but not necessarily inappropriate?
A. Not inappropriate, no.
Q. Did you respond to their telling you about her having given Mr. Mauti a ride to the

registry?
A. Yes.
Q. What did you say?
A. I said, I thought that is where she went because she was behind me when I was going home the previous morning with Mr. Mauti in the front seat of her car. The registry is in a strip mall and they turned into that shopping center.
Q. Where were you driving?
A. Franklin Street.
Q. Did you see Mr. Mauti in the car when you were going home that morning?
A. Yes.
Q. Did that strike you as unusual at the time?
A. Yes.
Q. Did you say anything to anybody about it that day?
A. The next day.
Q. When you say you said something to somebody about it the next day, are you talking about the two sergeants at change of shift?
A. Yes.
Q. Was anything else said in that conversation?

A. The conversation is from over a year ago and I can't recall everything that was said.

Q. So did you have occasion to discuss Mr. Mauti's arrest with either Sergeant Lacey or Sergeant Trombino after that discussion?

A. I am sure I did, yes.

Q. Why are you sure you did, do you remember it coming up on another occasion or being discussed in another way?

A. Certain things come up quite often.

Q. Do you remember when it next came up?

A. Not when, no. Not a date.

Q. Do you remember with whom you had the next discussion?

A. Probably Sergeant Lacey and Sergeant Trombino.

Q. At change of shift?

A. Yes, and Sergeant Williams. He is my actual supervisor on third. I fill him in on what happens on his day off.

Q. Was Sergeant Williams present for the next discussion where Mr. Mauti's arrest came up?

A. No.
Q. Do you think you have discussed it with Sergeant Williams?
A. Yes.
Q. Do you remember any of the discussion with Sergeant Williams?
A. Just the arrest itself.
Q. Do you remember Sergeant William's reaction? When you said the arrest itself, did you describe the circumstances of the arrest to Sergeant Williams?
A. Yes.
Q. Do you remember his response?
A. No. I don't remember his response.
Q. Was he surprised?
A. I don't remember.
Q. What is the next conversation that you had with Sergeant Trombino or Sergeant Lacey or both of them that you remember?
A. The following shift?
Q. Any conversation. It sound as though change of shift is the occasion for the first two conversations you had.
A. Yes.
Q. Did you have conversation with either of

them somewhere else or at some other time?
A. It has been a year plus, I am sure we have had conversations.
Q. Without getting bogged down in the sequence, tell me what you remember about the next conversation you had with them?
MR. COLUCCI: Objection to the form because that would be sequence.
Q. That is fair. Tell me what you remember about any other conversations you had with them concerning Mr. Mauti's arrest?
A. On some occasion I was told the case was dismissed at court. I was told Mr. Mauti filed a civil suit against Captain Matarese. Those are the two I can remember. I don't know when or the sequence, but I do remember people telling me that.
Q. Do you remember anything else about conversations you had on those occasions, either of those occasions?
A. No.
Q. Did you ever talk about Mr. Mauti's arrest with Patrolman Brancato?
A. Yes.

Q. When was the first conversation you had with Patrolman Brancato about the arrest?

A. The day Mr. Mauti was arrested.

Q. Who initiated that conversation, you or Officer Brancato?

A. I would say I did.

Q. Tell me about that conversation, what you said to him and what he said to you?

A. I went down to the booking area with Officer Brancato and Mr. Mauti. I told Officer Brancato Mr. Mauti is being charged with 31-10-1. I said, book him through the system and put him in a side room, he will be released with a summons. Officer Brancato said, okay.

Q. Was that the extent of that conversation?

A. Yes.

Q. Did you talk to Officer Brancato after that about Mr. Mauti's arrest?

A. I am sure I did.

Q. What did you talk to him about?

A. The charge that Mr. Mauti received.

Q. Do you remember whether you raised that issue or whether he raised that issue?

A. It was probably me.

Q. What did you say to Officer Brancato about the charge?
A. That it was the wrong charge. That normally in that situation, as far as myself and the officers I have seen, you just use the RITT summons. It is not an arrestable offense.
Q. What was Officer Brancato's reaction?
A. He agreed. He was a quiet guy.
Q. Did you tell Officer Brancato that in your role as supervisor to provide him with guidance for future use?
A. I am always his supervisor because I outrank him.
Q. I'm sorry. Of course. But did you tell him that in terms of instructing him for future reference that this is not an arrestable offense, or were you voicing an opinion without having an occasion to do so as his supervisor?
A. I think both. One, it is a learning curve for him, and two, since there had been no disposition on the case at that point I could have been wrong and it is a nonarrestable offense if the judge saw it

A. Yes.
Q. And you are not aware of anyone in the department ever make a custodial arrest for the offense that Mr. Mauti was charged for; is that correct?
A. To my knowledge.
Q. Those are the circumstances I guess I am asking you. Whether they are unusual enough that the motive would suggest, either suggested to you initially by Sergeant Lacey, or Sergeant Trombino, makes more sense than any other; is that accurate?
A. That her motivation was to --
Q. That she had a motivation other than keeping the roads safe for the rest of us drivers?
A. In my opinion, yes.
Q. Do you know whether anyone ever asked Chief Scuncio about it?
A. I don't know.
Q. Do you have a designated supervisor? Is there one person who is your designated supervisor or does it vary according to who is on duty?